**Dariush ELAHI, individually and as next-of-kin and representative of the Estate of Cyrus Elahi, Plaintiff,**

v.

**The ISLAMIC REPUBLIC OF IRAN and The Iranian Ministry of Information and Security, Defendants.**

**No. Civ.A. 99–2802(JHG).**

United States District Court, District of Columbia.

Dec. 20, 2000.

98

Jonathan Richard Mook, Dimuro, Ginsberg & Lieberman, P.C., Alexandria, VA, Philip Jay Hirschkop, Alexandria, VA, Marianne R. Merritt, Alexandria, VA, for plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOYCE HENS GREEN, District Judge.

This is an action for wrongful death brought by Dariush Elahi,[1] the brother of Cyrus Elahi, a United States national, who, before he was killed on October 23, 1990 in Paris, France, was a former university professor and a dissident of the Iranian regime. The Islamic Republic of Iran and the Iranian Ministry of Information and Security are named as defendants for ordering the killing of Cyrus Elahi in an act of state-sponsored assassination. Jurisdiction in this case is founded upon those provisions of the Foreign Sovereign Immunities Act of 1976 ("FSIA"), as amended, 28 U.S.C. §§ 1602–1611, that grant jurisdiction over foreign states and their officials and agents and that create federal causes of action for personal injury or death to American nationals resulting from state-sponsored terrorism.

Defendants have failed to enter an appearance in this lawsuit, notwithstanding the fact that service of process was made upon them in accordance with the statutory procedures. *See* 28 U.S.C. § 1608(a)(4).[2] On August 14, 2000, pursuant to 28 U.S.C. § 1608(e) and Fed.

1. Plaintiff, Dariush Elahi, is a naturalized United states citizen and is the administrator of his brother's estate. Dariush Elahi brings this action as administrator of Cyrus Elahi's estate and in his own right and on behalf of decedent's two other siblings.

2. Service of Process was accomplished on February 20, 2000, with the assistance of the Swiss Embassy in Tehran, the United States' protecting power in the Islamic Republic of Iran. This Court did not receive any response from the defendants, either through counsel's entry of appearance, or through a diplomatic note.

This Court takes judicial notice of the fact that the Islamic Republic of Iran is an experienced litigant in the United States federal court system in general and in this Circuit in particular. *See e.g., Foremost–McKesson v. Islamic Republic of Iran,* 905 F.2d 438 (D.C.Cir.1990); *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329 (9th Cir.1984); *McKeel v. Islamic Republic of Iran,* 722 F.2d 582 (9th Cir.1983).

R.Civ.P. 55(a), the Court entered an order of default against the defendants. Before the Court may enter a judgment by default in a specific monetary amount against the defendants, the FSIA provides that the plaintiff "establish [ ] his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).[3] Accordingly, on November 8 and 9, 2000, the Court conducted a non-jury trial[4] at which the plaintiff presented the testimony of seven witnesses: Kenneth Roger Timmerman, Executive Director, Foundation for Democracy; Ladan Boroumand, Ph.D.; Jacques S. Boedels, Armand, Boedels & Associates; Dariush Elahi; Jerome S. Paige, Ph.D.; Patrick J. Clawson, Ph.D.; and Manouchehr Ganji, Secretary-General, Flag of Freedom Organization. Documentary evidence consisting of 106 exhibits also was introduced in support of plaintiff's claims. Because Iran has presented no defense, the Court will accept as true the plaintiff's uncontroverted evidence. *See Higgins v. Islamic Republic of Iran,* No. 99–377 (D.D.C. Sept. 21, 2000) (Kollar–Kotelly, J.); *cf. Alejandre v. Republic of Cuba,* 996 F.Supp. 1239, 1243 (S.D.Fla.1997) (accepting as true the plaintiff's "uncontroverted factual allegations").

This Court has engaged in a systematic review of the evidence presented by the plaintiff and the legal issues raised by plaintiff's claim for relief. Upon the evidence adduced at trial, from which the following facts are found pursuant to Fed. R.Civ.P. 52(a), the Court concludes that, as required by 28 U.S.C. § 1608(e), the plaintiff has "establish[ed] his claim or right to relief by evidence that is satisfactory to the court." Accordingly, judgment shall be rendered in favor of the plaintiff as more fully set forth below.

## FINDINGS OF FACT

1. The defendant, the Islamic Republic of Iran ("Iran"), is a foreign state that was founded in 1979 by Ayatollah Khomeini following the overthrow of the prior government of the Shah of Iran. In 1989, after the death of Ayatollah Khomeini, Ali–Akbar Hashemi Rafsanjani became President and remained in that position into the 1990's. The current President of Iran is Mohammed Khatemi.

2. The United States Department of State has designated Iran as being a leading sponsor of terrorism for over a decade. Iran's direct support of terrorist activities has prompted the United States to suspend diplomatic relations, impose trade restrictions, and participate in the international embargo of the country. *See, e.g., Iran and Libya Sanctions Act of 1996,* Pub.L. 104–72, 10th Cong., 2d Sess. (Aug. 5, 1996), 110 Stat. 1541; 31 C.F.R. § 596.201 (prohibiting exports and sales to Iran). President Clinton recently reaffirmed and renewed sanctions against Iran when on March 15, 2000, he issued a Notice continuing the "national emergency" with respect to Iran "[b]ecause the actions and policies of the Government of Iran," including "its support for international ter-

---

3. Congress intended this provision to afford the same procedural protections to foreign states that Rule 55(e) of the Federal Rules of Civil Procedure gives to the United States. *See De Letelier v. Republic of Chile,* 488 F.Supp. 665, 667 n. 2 (D.D.C.1980); *Commercial Bank of Kuwait v. Rafidain,* 15 F.3d 238, 242 (2nd Cir.1994). Neither 1608(e) of the FSIA or Rule 55(e) "relieves the sovereign from the duty to defend cases and to obey court orders." *Rafidain,* 15 F.3d at 242. However, before judgment can be entered, the plaintiffs must put forth satisfactory evidence as to each element of their claim. *Compania Interamericana Export Import v.*

*Compania Dominicana De Aviacion,* 88 F.3d 948, 951 (11th Cir.1996).

4. This procedure has been followed in prior actions brought by victims (or the next-of-kin of victims) of terrorist acts sponsored by the Islamic Republic of Iran. *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 6 (D.D.C. 1998); *Cicippio v. Islamic Republic of Iran,* 18 F.Supp.2d 62, 67 (D.D.C.1998); *Anderson v. Islamic Republic of Iran,* 90 F.Supp.2d 107 (D.D.C.2000); *Eisenfeld v. Islamic Republic of Iran,* 2000 U.S. Dist. LEXIS 9545 (D.D.C. July 11, 2000); *Higgins v. Islamic Republic of Iran,* No. 99–377 (D.D.C. Sept. 21, 2000).

rorism," continue to "threaten the security, foreign policy and economy of the United States." Exhibit 15.

3. Iran uses several different organizations to carry out its pattern of terrorist activities. One of these organizations is the defendant Ministry of Information and Security ("MOIS"), the Iranian intelligence service.[5] With approximately 30,000 employees, MOIS is the largest intelligence agency in the Middle East and has an approximate annual budget of between $100–$400 million. *See Anderson*, 90 F.Supp.2d at 112–13 (finding MOIS's approximate annual budget between $100–$500 million). The United States Department of State has concluded that Iranian intelligence services facilitate and direct terrorist attacks, including attacks against regime opponents living abroad. Moreover, this policy is conducted with the "approval of the highest levels of the Iranian regime...."[6] United States Department of State, *Patterns of Global Terrorism: 1991*, April 1992, at 30; Exhibit 3.

4. At the time of the events at issue in this case, the Iranian Minister of Intelligence and head of MOIS was Ayatollah Fallahian. As explained by Dr. Clawson, Minister Fallahian actively participated in the creation of MOIS and was the most important decision maker within the organization.

5. Individuals implicated in the killing of Cyrus Elahi confirmed, under oath, to French authorities that Minister Fallahian was involved in ordering the killings of Iranian dissidents in Paris. Exhibit 58, p. 4; Exhibit 59, p. 110. German prosecutorial authorities, moreover, have issued a warrant for Minister Fallahian's arrest for ordering the 1992 assassination of Iranian Kurdish dissidents in Germany. In a 1992 interview on Iranian television, Minister Fallahian discussed MOIS' success in eliminating opponents of the regime, stating: "[W]e track them abroad too.... Last year we succeeded in striking fundamental blows to their top members." Exhibit 74; Tr. 341 (Ganji); Exhibit 45; Exhibit 46.

6. Following the establishment of the Islamic Republic of Iran, a number of organizations were formed outside the country in opposition to the clerical government. Mr. Timmerman, an expert on the Iranian government's sponsorship of terrorism, identified several of these opposition groups: the Flag of Freedom Organization, founded by Dr. Manoucher Ganji, the former Minister of Education in the Shah's regime, and his assistant, Cyrus Elahi; the Kurdish Democratic Party of Iran, which advocates a secular democracy for Kurds living in Northern Iran; the National Council of Resistance, which is dominated by the People's Mojahedin of Iran, an allegedly Marxist organization, based in Turkey and Iraq; the Constitutional Monarchist Organization; and the National Resistance Movement, organized by the exiled former Iranian Prime Minister Shahpour Bakhtiar, and his deputy Abdolrahman Boroumand, who, according to Kenneth Timmerman, were later both assassinated by agents of the Iranian government.

7. According to Dr. Clawson, the Iranian government sought to eliminate any effective opposition to the clerical regime by engaging in the widespread assassina-

---

5. Iran also operates in the Middle East through at least three surrogate organizations that receive Iranian funding; Hezbollah, a Lebanese Shiite organization; Hamas, or Islamic Resistance; and the Palestinian Islamic Jihad. The Court notes that previous lawsuits brought by victims (or the next-of-kin of victims) of Iranian sponsored terrorism have involved terrorist actions by these organizations. *See*, note 4, *supra*.

6. Dr. Patrick Clawson, Director of Research at the Washington Institute for Near East Policy and an expert on the Near East, testified that when this statement first was issued by the Department of State, "there was considerable debate ... about this judgment...." However, as a result of additional information that has emerged from Iran, Dr. Clawson opined that "this statement is now very widely accepted by Iran watchers and is no longer at all controversial." Tr. 250 (Clawson).

tion of dissidents both within Iran and abroad. Tr. 235 (Clawson). As explained by Mr. Timmerman, the Iranian government was concerned that Iranians living in exile would coalesce around a single opposition leader and become a threat to the regime. Mr. Timmerman described the pattern of terrorism and assassination undertaken by the Islamic Republic as being to "decapitate the opposition." Tr. 39 (Timmerman).[7]

8. According to Dr. Clawson, the Iranian government's initial campaign of assassinations proved successful and, accordingly, the clerics consolidated their power in Iran. A renewed concentration of assassinations began in 1989 following the end of the Iran–Iraq war and the death of the Ayatollah Khomeini. At that time, Mr. Rafsanjani assumed the presidency of Iran and in order to solidify his power, the government "redoubled its activities" to eliminate opponents of the regime. Tr. 235 (Clawson). Dr. Clawson explained that based upon his research, he determined that "Mr. Rafsanjani devoted a lot of attention, a lot of resources" to directing these assassinations and evidence of direct Iranian involvement in those assassinations comes "from numerous accounts . . . just how much priority Mr. Rafsanjani placed on this campaign." Tr. 235 (Clawson). Dr. Clawson testified that there were a "great many killings" during this campaign, and Iran "assassinated some of the top leaders of the major [opposition] organizations." Tr. 237, 240–41 (Clawson).

9. The scope of the terrorist activities launched against those organizations opposed to the current Iranian government and others has been worldwide. The testimony and documentary evidence introduced at trial, including reports by the United States and foreign governmental authorities, human rights groups, and the world press indicate that Iran and MOIS have authorized, sponsored, and directed the assassination of critics and opponents of the Iranian regime in countries throughout the world. Criminal investigations in both France and Germany and the decisions of the courts of those countries have found evidence of direct involvement by the government of Iran, MOIS, and Minister Fallahian in the killings of opponents of the Tehran regime. Exhibits 58, 59 (France); Exhibits 18, 46, 47, 48 (Germany). The Parliamentary Human Rights Group of the Palace of Westminster in Great Britain has documented the Iranian government's "use of terrorism as an adjunct to foreign policy." Exhibit 17, p. 5. Amnesty International has issued reports describing Iran's use of torture, terrorism, and possible assassination as instruments of state policy. Reports in the world press have further documented the actions of the Iranian government in oppressing its political opponents.

10. The Flag of Freedom Organization ("FFO") is an opposition group, founded by Dr. Manoucher Ganji, a former Professor of International Law at Tehran University and Minister of Education under the Shah's regime. The FFO is a democratic movement whose stated aims and purposes are the realization of the rights and freedoms of the Iranian people and the establishment of a pluralistic and parliamentary democracy in Iran. Through the operation of a radio station in Egypt and the distribution of videotapes and printed materials, the FFO provided news and information worldwide about events in Iran and the suppression of individual rights and free speech within that country. The

---

7. As part of his study and investigation of the Iranian government's campaign against opponents of the regime, Mr. Timmerman compiled a chronological list of specific Iranian terrorist attacks against dissidents. This document, which was submitted into evidence as Exhibit 29, is persuasive evidence of the pattern of assassinations instituted by the Iranian government to silence its critics. Mr. Timmerman testified that in those cases of assassination he had investigated, the Iranian government consulate or embassy was directly involved in providing safehouses, automobiles, money, passports, and escape routes to the perpetrators of these offenses.

FFO also organized resistance networks within Iran and in Turkey, which borders on Iran and has a large Persian community. The Tehran regime was extremely concerned about the FFO's radio broadcasts into Iran, and sought to stop the transmission.

11. Dr. Ganji's key assistant in building in FFO was Cyrus Elahi, whom Dr. Ganji had known for many years. Dr. Elahi was born in Iran in 1943. He came to the United States in 1958 with his mother and three siblings to join his father who previously had emigrated to the United States to pursue his medical education. In 1961, Dr. Elahi and his siblings became naturalized United States citizens. Cyrus Elahi attended school in the United States and received his undergraduate degree and his Ph.D. from American University in Washington, DC.

12. In the 1970's Dr. Elahi returned to Iran. Dr. Elahi became an assistant professor of political science at the National University in Tehran and, with Dr. Ganji, participated in a "think tank" that submitted reports on Iranian economic, social, and political developments to the wife of the Shah "in the hope of improving the situation." Tr. 274–75 (Ganji). When Dr. Ganji was named Minister of Education, Dr. Elahi became his close advisor.

13. Following the Khomeini revolution in 1979, both Dr. Ganji and Dr. Elahi went into hiding. A list of 200 individuals, including Dr. Ganji and Dr. Elahi, deemed to be opponents and enemies of the new regime and calling for their arrest, was posted in the mosques throughout Iran. According to Dr. Ganji, in addition to the posting of this list, a Fatwa (religious edict) has been issued calling for Dr. Ganji's death and both Dr. Ganji and Dr. Elahi

understood that a similar edict was issued for Dr. Elahi's assassination.[8]

14. After the revolution, Dr. Elahi hid Dr. Ganji in his home and, then, assisted Dr. Ganji in fleeing Iran. After aiding Dr. Ganji in his escape, Dr. Elahi and his wife fled the country shortly thereafter. Both Dr. Ganji and Dr. Elahi settled in the United States. For several years, Dr. Elahi lived in Texas, California, and Michigan. At that time, Dr. Elahi's sister was attending the University of Michigan, and he became an associate professor of political science at Michigan State University, in part, to be close to her. Later, Dr. Elahi left his teaching position to join Dr. Ganji, who was then living in Dallas, Texas, to assist him in running an educational and cultural foundation.

15. In 1985, Dr. Ganji relocated to Paris to work with other Iranian exiles in seeking a free and democratic Iran. In mid–1986, Dr. Elahi joined Dr. Ganji in Paris and both of them established the Flag of Freedom Organization to actively promote the establishment of a pluralistic society in Iran.

16. In October 1990, French authorities informed Dr. Ganji that they had uncovered a plan to assassinate him, and, at their suggestion, he left Paris and went to Egypt. At the time, Dr. Elahi was in Munich, Germany. However, he returned to Paris and on the morning of October 23, 1990, as he was leaving his apartment building, Dr. Elahi was shot eight times and killed by an assassin using a gun with a silencer. Exhibit 59, p. 82. Although Dr. Elahi normally did not leave his apartment building unaccompanied, on the morning he was assassinated, he was delayed and missed the colleague whom he customarily would meet to accompany him to the FFO offices.

8. A Fatwa is an edict of a religious leader, authorizing a faithful Muslim to commit murder, in this case, against certain opponents of the Iranian regime. Fatwas are not publicly distributed; hence, the fact that one has been issued against a specific person must be gleaned indirectly. The Fatwa issued against Dr. Ganji (Exhibit 105), and introduced into evidence at the hearing in this case, was obtained by Dr. Ganji from sources within the Iranian government.

17. As the attorney for the Elahi family in France, Mr. Boedels reviewed the investigatory reports and the evidence compiled by Jean–Louis Bruguiere, Senior Examining Magistrate of the District Court of Paris. Exhibits 58, 59. Judge Bruguiere opened two files on the Elahi assassination, the first for his murder and the second for "association of wrongdoers," which is equivalent to a charge of conspiracy. Tr. 120 (Boedels). Judge Bruguiere's inquiry into Dr. Elahi's death implicated two Iranian nationals living in Paris, Mojtaba Mashadi and Hossein Yazdanseta.

18. According to the French indictment of Mr. Mashadi, handed down by the Appellate Court of Paris, Second Criminal Panel, a gun and a silencer were found on the premises of Dr. Elahi's apartment building.

19. Under interrogation, Mr. Yazdanseta confessed to having been part of a plot to assassinate Iranian political dissidents in Paris. Mr. Yazdanseta stated under oath to Judge Bruguiere that Mr. Mashadi had stated that he had been entrusted in Tehran with the organization of the assassination of Cyrus Elahi. Exhibit 58 at 11; Exhibit 59 at 96–99. According to Mr. Yazdanseta's sworn statement to Judge Bruguiere, he had a conversation with Mr. Mashadi in July or August of 1993 at Mr. Mashadi's home. During that conversation, Mr. Mashadi admitted that he was the organizer of the operation to assassinate Cyrus Elahi, that a gun and silencer had been given to him in Paris by Iranian contacts, and that he had enlisted a Mr. Ghorbanifar to assassinate Cyrus Elahi, but that Mr. Ghorbanifar had backed out at the last minute. Exhibit 59 at 97–99. According to Mr. Yazdanseta's sworn statement, the assassination was then carried out by another team of two or three men, but Mr. Mashadi had not given him any more information how the assassination was carried out. In referring the indictment of Mojtaba Mashadi to the Court of Assize of Paris, the Appellate Court of Paris relied on, among other

things, the fact that Mr. Yazdanseta stated under oath that Mr. Mashadi had confided to him that he had been put in charge of organizing the assassination of Cyrus Elahi. Exhibit 59 at 83.

20. Other witnesses testified that Mr. Mashadi was a MOIS agent in France and that he had traveled to Iran to meet with Minister Fallahian and Minister Fallahian had given orders to Mashadi to assassinate dissidents. Mr. Boedels testified to this Court that Mr. Ghorbanifar had stated under oath to Judge Bruguiere that Mr. Mashadi had told him that he had been to Iran and met with Minister Fallahian. According to the record of Mr. Ghorbanifar's testimony under oath to Judge Bruguiere, taken on April 11, 1995, Mr. Mashadi told Mr. Ghorbanifar that he had been to Tehran in November 1989 and met with Minister Fallahian and other members of MOIS. Mr. Mashadi told Mr. Ghorbanifar that he had been put in charge of organizing the assassination of Dr. Ganji and several other dissidents (but did not mention Dr. Elahi). This conversation took place upon Mr. Mashadi's return from Tehran. According to Mr. Ghorbanifar, Mr. Mashadi told him this in an attempt to gain his assistance in carrying out the assassination of Dr. Ganji. Instead, Mr. Ghorbanifar revealed the information to the French authorities, who alerted Dr. Ganji to the threat.

21. Mr. Ghorbanifar also testified to Judge Bruguiere that in 1989, he accompanied Mr. Mashadi to a meeting at the Orly airport. Also present at this meeting, according to Mr. Ghorbanifar, was Ali Ahani, the Iranian Ambassador; Mr. Anguizi, the manager of Iran Air; and a man identified as Bagher. Later, according to Mr. Ghorbanifar, Mr. Mashadi identified Bagher as an agent of Iran.

22. Mr. Farhad Ghiasvand, an acquaintance of Mr. Mashadi, gave two sworn statements to Judge Bruguiere. In the sworn statement dated June 23, 1994, Mr. Ghiasvand stated that he had met Mr. Mashadi in Tehran in 1989, and Mr. Mash-

adi had told him that he was working for MOIS, and he had contact with Minister Fallahian. Mr. Mashadi importuned Mr. Ghiasvand to assist him in assassinating a Iranian dissident in Paris. Exhibit 59 at 101. In the sworn statement dated January 10, 1994, Mr. Ghiasvand stated that Mr. Mashadi had identified Dr. Elahi as the target of the plot. Mr. Ghiasvand declined to participate. Exhibit 59 at 124. In both statements, Mr. Ghiasvand recounted that he had a further discussion with Mr. Mashadi in mid–1993, in which he reminded Mr. Mashadi of the prior conversation. According to Mr. Ghiasvand, Mr. Mashadi, threatened to "denounce [him] to the police" and denied the prior conversation. Exhibit 59 at 102, 124.

23. On December 29, 1993, Mr. Ali Reza Ghanaee Miandoab was questioned by the French police. Mr. Miandoab stated that in December 1992, Mojtaba Mashadi, whom he had known for about thirty years, had asked him whether he would assist in the assassination of an individual named Shafa and Dr. Ganji. Mr. Miandoab declined the request. According to Mr. Miandoab, Mr. Mashadi further stated that he was acting on behalf of the Iranian intelligence and that he had arranged for Mr. Ghorbanifar to kill Cyrus Elahi, but that he had backed out. Finally, Mr. Mashadi stated to Mr. Miandoab that Iranian intelligence agents, with whom he had contact in Iran, had been sent to Paris to carry out the assassination of Cyrus Elahi. Exhibit 59 at 108.

24. The evidence gathered by Judge Bruguiere strongly indicates that the original plot, as conceived by MOIS, was to assassinate a number of individuals opposed to the Tehran regime, including Dr. Ganji, Dr. Cyrus Elahi, and others. Tr. 130 (Boedels). According to Mr. Boedels, who testified to this Court, Mr. Mashadi importuned Mr. Yazdanseta and Mr. Ghorbanifar to carry out the plot. Mr. Mashadi offered Mr. Yazdanseta money to take the photograph of Dr. Ganji or Cyrus Elahi and told him that he would be paid an additional sum if he would kill the person so identified. Tr. 131 (Boedels). Mr. Mashadi also enlisted the assistance of Mr. Ghorbanifar. However, Mr. Ghorbanifar did not continue with the conspiracy. Instead, he contacted the French secret service and provided information to the French authorities. Mr. Ghorbanifar's revelations prompted the French authorities to warn Dr. Ganji that his assassination was imminent.

25. In addition to testimony obtained through the interrogation of Messrs. Mashadi, Yazdanseta, and Ghorbanifar, Judge Bruguiere also obtained answers to written questions of a high ranking Iranian defector, who had been detained by German authorities. This defector, Mr. Mesbahi, confirmed to Judge Bruguiere that the assassination of Dr. Elahi was organized and executed by Iranian government officials. Tr. 129 (Boedels); Exhibit 59 at 84.

26. Messrs. Mashadi and Yazdanseta were tried before the Paris Supreme Criminal Court, and, in September 1996, they were convicted of conspiracy to commit terrorist acts, including the planned assassinations of Dr. Ganji and Cyrus Elahi. Mr. Mashadi was sentenced to seven years' imprisonment and Mr. Yazdanseta to three years' imprisonment. Tr. 121 (Boedels). These convictions have been upheld by the French appellate courts.

It stands uncontradicted that the murder of Dr. Elahi was an act of assassination undertaken and directed by agents of defendant MOIS at the behest of defendant Islamic Republic of Iran.

### CONCLUSIONS OF LAW WITH RESPECT TO JURISDICTION AND LIABILITY

In the Antiterrorism and Effective Death Penalty Act of 1996 ("Antiterrorism Act"), Congress lifted the sovereign immunity of foreign states for acts of state sponsored terrorism. Pub.L. No. 104–132, Title II, § 221(a) (April 24, 1996), 110 Stat. 1241 *codified at* 28 U.S.C. § 1605(a)(7)

(West 1997 Supp.). The Antiterrorism Act specifically creates an exception to the immunity of those foreign nations officially designated by the Department of State as terrorist states when that nation commits a terrorist act, or provides material support and resources to an individual or entity that commits such an act, resulting in the death or personal injury of a United States national. 28 U.S.C. § 1607(a)(7).

The stated purpose of the Antiterrorism Act is to deter terrorist acts against U.S. nationals by foreign sovereigns or their agents and to provide for justice for victims of such terrorism. *See* 110 Stat. 1214 (1996). Thus, by enacting the statute, Congress manifested its intent that U.S. nationals who are "victims of terrorist states be given a judicial forum in which to seek redress." *Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38, 50–51 (D.D.C.2000). As explained by Judge Friedman in *Daliberti:* "Those nations that operate in a manner inconsistent with international norms should not expect to be granted the privilege of immunity from suit, that is within the prerogative of Congress to grant or withhold." *Daliberti,* 97 F.Supp.2d at 52.

Because, as discussed below, this matter comes within the state sponsored terrorism exception to foreign sovereign immunity, this Court has original subject matter jurisdiction in this case. Pursuant to § 1330(a) of Title 28, the district courts "have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity under sections 1605–1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a). *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989).[9]

The Antiterrorism Act merely waived the sovereign immunity of state sponsors of terrorism. To create a cause of action for victims of terrorism, Congress enacted a separate piece of legislation. Civil Liability for Acts of State Sponsored Terrorism, Pub.L. No. 104–208, § 589, 110 Stat. 3009 (1996) (codified at 28 U.S.C. § 1605 note). The legislation provides a cause of action against a foreign state and its agents for any act which would give a court jurisdiction under 28 U.S.C. § 1605(a)(7). *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12–13 (D.D.C.1998). This provision is commonly referred to as "Flatow Amendment."[10]

■ In order to establish subject matter jurisdiction and state a claim pursuant to the FSIA, as amended by the Antiterrorism Act, 28 U.S.C. § 1605(a)(7), and the Flatow Amendment, 28 U.S.C. § 1605 note, a claim must contain the following elements:

(1) that personal injury or death resulted from an act of torture, extrajudicial killing, aircraft sabotage, or hostage taking; and

**9.** The Court also has in personam jurisdiction over the defendants. The Foreign Sovereign Immunities Act provides that personal jurisdiction over a defendant will exist where, as here, the plaintiff establishes the applicability of an exception to immunity pursuant to 28 U.S.C. § 1605 and service of process has been accomplished pursuant to 28 U.S.C. § 1608. 28 U.S.C. § 1330(b). Both of those requirements have been met here. *See also Foremost–McKesson v. Islamic Republic of Iran,* 905 F.2d at 442 ("Personal jurisdiction under FSIA exists so long as subject matter jurisdiction exists and service of has been properly made pursuant to 28 U.S.C. § 1608"). Venue

appropriately lies in this district court because the federal venue statute provides that actions against a foreign state and a state's agent or instrumentality may be brought in the United States District Court for the District of Columbia. 28 U.S.C. § 1391(f)(4).

**10.** Although this provision of the statute has been published as a note to 28 U.S.C. § 1605, it has been interpreted as being an "independent pronouncement of law." *Flatow,* 999 F.Supp. at 12. In addition, section 1605(a)(7) and the Flatow Amendment are interpreted *in pari materia. See Flatow,* 999 F.Supp. at 13.

(2) the act was either perpetrated by a foreign state directly or by a non-state actor which receives material support or resources from the foreign state defendant; and

(3) the act or provision of material support or resources is engaged in by an agent, official, or employee of the foreign state while acting within the scope of his or her office, agency, or employment; and

(4) that the foreign state be designated as a state sponsor of terrorism either at the time the incident complained of occurred or was later so designated as a result of such act; and

(5) if the incident complained of occurred within the foreign state defendant's territory, plaintiff has offered the defendants a reasonable opportunity to arbitrate the matter; and

(6) either the plaintiff or the victim was a United States national at the time of the incident; and

(7) similar conduct by United States agents, officials, or employees within the United States would be actionable.

28 U.S.C. § 1605(a)(7) and 28 U.S.C. § 1605 note. Each of these requirements is satisfied in this case, as detailed below or in other portions of this opinion. As earlier noted, the plaintiff has "established his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e).

**I. Extrajudicial Killing**

■ The murder of Cyrus Elahi constitutes an extrajudicial killing. The state sponsored terrorism exception to immunity expressly adopts the definition of extrajudicial killing set forth in the Torture Victim Protection Act of 1991, Pub.L. No. 102–256, § 3(a), 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). 28 U.S.C.

§ 1605(e)(1). That Act defines an extrajudicial killing as:

a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Pub.L. No. 102–256, § 3(a). The murder of Cyrus Elahi fits within the definition of extrajudicial killing. First, the uncontroverted evidence introduced at trial demonstrated that the assassination of Cyrus Elahi was a deliberate act. Second, Cyrus Elahi was not afforded the judicial process contemplated by the statute. Third, as this Court stated over twenty years ago, assassination is "clearly contrary to the precepts of humanity as recognized in both national and international law." *De Letelier*, 488 F.Supp. at 673. *See also Xuncax v. Gramajo*, 886 F.Supp. 162, 185 (D.Mass. 1995) ("[E]very instrument and agreement that has attempted to define the scope of human rights has 'recognized a right to life coupled with a right to due process to protect that right.' ") (citation omitted); *Forti v. Suarez–Mason*, 672 F.Supp. 1531, 1542 (N.D.Cal.1987) ("The proscription of summary execution or murder by the state appears to be universal, is readily definable, and is of course obligatory."); RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 702(c) (1986) ("A state violates international law if, as a matter of state policy, it practices, encourages, or condones ... the murder or causing the disappearance of individuals.").

**II. Foreign State Actor or Provision of Material Support**

Based on the unconverted evidence introduced at trial, the Court is satisfied that the murder of Cyrus Elahi was perpetrated by agents of MOIS acting at the direction of, and in furtherance of the poli-

cies of, the Islamic Republic of Iran.[11] As a result, both the Islamic Republic of Iran and MOIS may be held responsible under the FSIA for the consequences of their actions. Indeed, in cases where the involvement of the Iranian government in specific terrorist acts was much less direct and involved only the provision of support and resources to terrorist groups, liability was found to exist under the FSIA. *See Flatow*, 999 F.Supp. at 10 (holding Iran and MOIS liable for terrorist bombing by Islamic Jihad, which resulted in the death of an American citizen); *Eisenfeld*, 2000 U.S. Dist. LEXIS 9545 at *14–16 (finding Iran and MOIS liable for the death of American citizen who was killed in terrorist bombing by Hamas because Hamas received material support from defendants).

## III. State Sponsor of Terrorism

The Antiterrorism Act requires that the foreign state be designated as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979, 50 U.S.C.App. § 2405(j). 28 U.S.C. § 1605 note. The Export Administration Act calls upon the Secretary of State to make a determination that a foreign state has "repeatedly provided support for acts of international terrorism and to notify the

relevant committees of both Houses of Congress, and to publish the determination in the Federal Register." 50 U.S.C.App. § 2405(j).

The Islamic Republic of Iran has been designated a "state sponsor" of terrorism pursuant to these provisions of the Export Administration Act continuously since January 1984. *See Cicippio*, 18 F.Supp.2d at 68. *See also* 49 Fed.Reg. 47702 (Dec. 6, 1984). Iran continues to be designated a state sponsor of terrorism. 22 C.F.R. § 126.1(d); 31 C.F.R. § 596.201. *See also* U.S. DEPARTMENT OF STATE, PATTERNS OF GLOBAL TERRORISM, 1999 (April 1, 2000).

## IV. United States National

The FSIA requires that either the claimant or the victim be a "national of the United States," as the term is defined by the Immigration and Nationality Act, "when the act of state sponsored terrorism occurred." 28 U.S.C. § 1605(a)(7)(B)(ii).[12] In this case, Cyrus Elahi was a nationalized United States citizen at the time he was assassinated by agents of the Islamic Republic of Iran and MOIS.[13] The claimant here, Dariush Elahi, also is a naturalized United States citizen. Hence, Dariush Elahi, as Cyrus Elahi's next of kin and representative of Cyrus Elahi's estate, has properly brought this action under the FSIA.[14]

11. The definition of "foreign state" in the FSIA includes agencies and instrumentalities of a foreign state. 28 U.S.C. § 1603(a), (b). *See Foremost–McKesson*, 905 F.2d at 446. Defendant MOIS is an agency of the Iranian government. *See Anderson*, 90 F.Supp.2d at 112–113. Accordingly, MOIS, as well as the Islamic Republic of Iran, is liable under the FSIA.

12. The Immigration and Nationality Act defines the term "national of the United States" as (a) a citizen of the United States, or (b) a person who, though not a citizen of the United States, has permanent allegiance to the United States." 8 U.S.C. § 1101(a)(2).

13. Cyrus Elahi became a U.S. citizen in 1961. A photocopy of Cyrus Elahi's passport was admitted into evidence. Exhibit 53.

14. Because the murder of Cyrus Elahi occurred in Paris, France—not in Iran—the fifth

element for coverage under the FSIA, see supra, addressing incidents within the foreign state's own territory does not apply. *See* 28 U.S.C. § 1605(a)(7)(B)(i).

The Flatow Amendment, 28 U.S.C. § 1605 note, adds the requirement that the liability of foreign states and their officials and agents be comparable to that of the United States and its agents, officials and employees. *See supra* (seventh required element of cause of action under state sponsored terrorism exception). There can be no serious dispute that if officials or agents of the United States, while acting in their official capacities, arranged for and directed the assassination of a critic of the United States government, they would not be immune from civil suits for wrongful death. *See* U.S. Const. Amend. 5; *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

## CONCLUSIONS OF LAW WITH RESPECT TO DAMAGES

### I. Count I—Wrongful Death

■ The FSIA, as amended, establishes a cause of action for wrongful death proximately caused by an act of state sponsored terrorism—in this case the extrajudicial killing of Cyrus Elahi. The statute provides, *inter alia*, that money damages, including economic damages, solatium, pain and suffering, and punitive damages are available in actions brought pursuant to the FSIA. 28 U.S.C. § 1605 note. Compensation may be awarded to a decedent's heirs-at-law for both the economic and emotional losses that result from the decedent's premature death due to acts of state sponsored terrorism.[15] *See Flatow*, 999 F.Supp. at 27–28; *Eisenfeld*, 2000 U.S. Dist. LEXIS 9545 at *16; *Alejandre v. Republic of Cuba*, 996 F.Supp. 1239, 1249–50 (S.D.Fla.1997).

### A. Economic Damages

The economic losses flowing from a person's untimely death include the loss of accretions to his estate. The evidence established that had Cyrus Elahi not been killed, he could have continued to pursue his work with the Flag of Freedom Organization, or he could have returned to the academic world to pursue a teaching career.

Which career path Cyrus Elahi would have chosen is not susceptible to precise determination. Accordingly, the plaintiff's economic expert, Jerome Paige, Ph.D., performed two separate calculations of lost income. The first calculation was based upon the assumption that Cyrus Elahi would have returned to academia had he not been assassinated. The second calculation assumed that Cyrus Elahi would have continued his work with the Flag of Freedom Organization. For each of these assumptions, Dr. Paige used a typical mean earnings approach for a similarly situated 47–year old male. According to Dr. Paige's calculations, Cyrus Elahi's lifetime earnings would have been $725,359 had he continued working for the Flag of Freedom Organization and $967,626 had he returned to the academic world. Tr. 197–198 (Paige); Exhibit 100.

Although the evidence demonstrated that Cyrus Elahi could have returned to his academic career, his true passion, and the one to which he fully devoted the last four years of his life, was his work for the Flag of Freedom Organization. Accordingly, for purposes of calculating economic losses, the Court will assume that Dr. Elahi would have continued his work with the Flag of Freedom Organization and that the financial loss to his estate resulting from his untimely death is $725,359, the lower of Dr. Paige's two calculations. An award of this amount, therefore, will be rendered to Cyrus Elahi's estate for lost accretions.

In addition to these economic losses, Dariush Elahi, as executor of Cyrus Elahi's estate, also incurred $14,676 in funeral expenses, which includes the cost of the funeral in Paris, the burial plot in Maryland, the gravestone, and the cost of travel to and from Paris. The Court finds that these expenses were appropriately incurred and should be recovered as part of the compensatory damage award in this case.

### B. Solatium

#### 1. Legal Standards for Awarding Solatium Damages

■ The statutory provision creating the cause of action for state sponsored terrorism also permits solatium damages. 28 U.S.C. § 1605 note. A claim for solati-

---

**15.** Recently enacted amendments to the FSIA allow plaintiffs in specifically designated lawsuits against the Iranian government to recover an award of compensatory damages from Iranian assets frozen by the United States government. *See* Pub.L. No. 106–386, § 2002(a)–(c) (October 28, 2000). As counsel acknowledged, this lawsuit does not appear to come within the provisions of the new legislation.

um refers to the "mental anguish, bereavement and grief resulting from the fact of decedent's death[.]" *Flatow*, 999 F.Supp. at 30. The loss of decedent's society and comfort is also encompassed within solatium. *Id.* at 31. Solatium may include a claim for loss of a sibling where the claimant proves a close emotional relationship with the decedent. *See Flatow*, 999 F.Supp. at 30.

The testimony in this case established that Cyrus Elahi was the eldest of four children and that he had two brothers, Dariush (the administrator of his estate) and a younger brother, and a sister. Cyrus Elahi's father was born in Iran, but came to the United States in 1948 to pursue his medical education. At the time, his wife and children remained in Iran. Later, in 1958, the family moved to the United States. In 1961, all of the children became naturalized U.S. citizens. Shortly thereafter, in 1962, Cyrus' mother and father divorced.

Following his parents' divorce, Cyrus, the eldest, took care of his younger siblings and, as described by his brother, Dariush, "assumed the role of a friend, advisor, confidante, father." Cyrus Elahi also provided monetary support to the rest of the family, including his mother and siblings. He helped to pay for the college education of his siblings and, while Dariush was attending college at American University in Washington, D.C., where Cyrus also taught, Dariush lived with his brother, and Cyrus placed all of his money in a joint checking account for Dariush's use.

Because Dariush and Cyrus were closest in age, a special bond developed between them. Prior to going to Paris to join Dr. Ganji, Cyrus Elahi discussed with Dariush the anguish that he felt. Cyrus informed his brother that if he joined Dr. Ganji in Paris, this would be the end of his marriage. Cyrus gave some of his personal effects to his brother for safekeeping. After Cyrus Elahi joined Dr. Ganji in Paris, Cyrus continued to remain in contact with

his brother and would visit him in the United State at least twice yearly. Dariush Elahi testified that his brother "would make it a point to come and visit me" because, at the time, Dariush was in the midst of his medical training and could not travel to Paris. Later, when his medical training was completed, Dariush visited his brother on several occasions in Paris and, shortly before his assassination, in Germany.

The grief and anguish Dariush experienced as a result of the death of his brother, Cyrus, which he relived during the hearing on this matter, was readily apparent during his testimony. He stated, "I believe I was closer to him than I was to my father at any time in my life." Dariush Elahi also read into the record a statement written by his younger brother, who presently lives in California. That statement captures the strong, emotional feelings that the members of the Elahi family had for Cyrus Elahi and the exceptional loss they have experienced as a result of his death. Cyrus' younger brother wrote as follows:

As our parents were divorced when the children were young, Cyrus being the oldest child, adopted many of the father's responsibilities to his siblings. He encouraged all of us to be and do better. He financially and emotionally supported us.... He was always there for us.... These actions, combined with [his] optimistic nature, even in the face of sometimes sorry circumstances, carried us forward individually and as a family. Given all the strengths and all he did and how he loved us .... [one] can only imagine what a wonderful brother and central hub to my family, including my mother, my father, and cousin (all of whom grew up together in the same household), Cyrus was to us. My mother .... was destroyed by Cyrus' assassination....

Not because he was my brother, but because of who he was, Cyrus was very special and inspiring. He left a long

trail of people who live—whose life he positively touched, and he had so much more to offer....

Testimony about the mental anguish and grief experienced as a result of the death of a loved one is sufficient to sustain a claim for solatium. *See Flatow,* 999 F.Supp. at 30. In this case, Dariush Elahi testified about his deep feelings for his brother and the extreme sorrow he and the Elahi family felt when they learned of their brother's violent death.

Moreover, as noted by Judge Lamberth in *Flatow,* the depth of a person's suffering may not be totally manifested on the stand. As noted in *Flatow,* "in the long term, the sudden death of a loved one may manifest itself as 'a deep inner feeling of pain and anguish often borne in silence.'" *Flatow,* 999 F.Supp. at 31 (quoting *Connell v. Steel Haulers, Inc.,* 455 F.2d 688 (8th Cir.1972)).

Individuals can react very differently even under similar circumstances; while some sink into clinical depression and bitterness, others attempt to salvage something constructive from their personal tragedy. Such constructive behavior should not be considered as mitigating solatium, but rather as an equally compensable reaction, one in which courage to face their own mental anguish prevails in order to survive, and in some circumstances, to benefit another.

*Id.*

In this case, the deep loss experienced by the brother of Cyrus Elahi may linger for an extensive period of time because of the circumstances of their brother's death. "When death results from terrorism, the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." *Flatow,* 999 F.Supp. at 31. As stated by the court in *Higgins v. The Islamic Republic of Iran,* No. 99–377, slip. op. at 14 (D.D.C. Sept. 21, 2000), "death as a result of terrorism, with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding."

**2. Court's Award of Solatium Damages**

██ · Unlike a claim for lost wages, the amount to be awarded for the loss of solatium "cannot be defined through models and variables." *Flatow,* 999 F.Supp. at 32. Nor can solatium damages be reduced to present value. As explained by Judge Lamberth, "[w]hile economic losses can be reduced to present value with simple equations to establish the amount of an annuity established today which would have matched the decedent's ostensible income stream, the scope and uncertainty of human emotion renders such a calculation wholly inappropriate." *Id.* (citing *Drews v. Gobel Freight Lines, Inc.,* 144 Ill.2d 84, 161 Ill.Dec. 324, 578 N.E.2d 970 (1991); *U.S. v. Hayashi,* 282 F.2d 599, 606 (9th Cir.1960)).

The awards in cases similar to the one at bar provide the Court with some guidance as to the appropriate amount to award to a decedent's relatives for a death caused by terrorist acts. In *Flatow,* the court awarded $5,000,000 to each of the parents and $2,500,000 to each sister and brother of Alisa Flatow. 999 F.Supp. at 32. In *Eisenfeld,* 2000 U.S.Dist. LEXIS 9545 at 18, the court, similarly, awarded $5,000,000 to each of the parents of Matthew Eisenfeld and to the mother of Arline Duker, who was also killed in the terrorist bombing. In addition, the court awarded $2,500,000 to the sister of Mr. Eisenfeld and the same amount to the two sisters of Ms. Duker. *Id.*

██ In this case, the uncontroverted testimony establishes that Cyrus Elahi not only was a dearly beloved brother to his two younger brothers, but he also fulfilled the role of the head of the family and his loss may be said to be that of a brother and a father.[16] Notwithstanding the inher-

16. Although there was significant testimony regarding the mental anguish and loss of soci-

ent uncertainty of calculating an award of solatium, this Court concludes that an award in the amount of $5,000,000 to each of the two brothers of Cyrus Elahi would be appropriate for the profound emotional loss they have experienced and undoubtedly will continue to experience in the future. Therefore, the Court awards $5,000,000 to Dariush Elahi, on behalf of himself and $5,000,000 to Cyrus Elahi's younger brother, Elham Elahi. *See Flatow,* 999 F.Supp. at 32 (awarding the plaintiff $20,000,000 for solatium on behalf of decedent's heirs-in-law, including decedent's siblings).

### III. Count II—Action for Survival Damages

■ The courts have recognized that an action may be pursued under the FSIA for survival damages for the emotional distress and the pain and suffering resulting from acts of state sponsored terrorism. *See Flatow,* 999 F.Supp. at 28; *Eisenfeld,* 2000 U.S.Dist LEXIS 9545 at *16–17. Thus, a cause of action that could have been brought by Dr. Elahi but for his death, may be asserted in this lawsuit for the benefit of the estate. In Count II of the Complaint, Dariush Elahi asserts such a claim on behalf of the estate.

■ The plaintiff requests damages for the years of fear that Cyrus Elahi endured before his assassination. According to the plaintiff, this "pre-impact emotional distress," which occurred well before the actual incident that resulted in death, is compensable in an action for survival damages. The cases cited by the plaintiff, however, do not support such a notion. *See, e.g., Beynon v. Montgomery Cablevision Limited Partnership,* 351 Md. 460, 718 A.2d 1161 (1998) (affirming award of damages

for pre-impact fear suffered by decedent as he became aware that auto crash was imminent); *Yowell v. Piper Aircraft Corp.,* 703 S.W.2d 630, 634 (Tex.1986) (affirming award of damages for "mental anguish the decedents suffered from the time of the plane's breakup until it hit the ground"). The general rule in survival actions is that damages are limited to those suffered during the period between injury and death. *See* HARPER, JAMES & GRAY, 4 THE LAW OF TORTS § 24.6, p. 474 (2d ed.1986). The cases cited by the plaintiff similarly stand for the unremarkable proposition that mental anguish flowing from wrongful conduct of the defendant is compensable. In this case, the wrongful conduct of the defendant was the "extrajudicial killing" of Cyrus Elahi. The "pre-impact emotional distress," while perhaps real, was not a result of the specific incident of wrongful conduct complained of by the plaintiff. The distress felt by Cyrus Elahi was the result of the pre-existing threat to his life, and existed independent of the ultimate act of assassination. Therefore, no damages for such pre-impact distress are available.

■ The plaintiff also claims damages for the pain and suffering Cyrus Elahi experienced while he was being attacked and killed in his apartment building. As discussed above, this type of pain and suffering is compensable. *See* HARPER, *supra,* § 25.16, at 612—613 (stating that decedent's pain and suffering prior to death is compensable under many survival statutes, but '[i]f death was instantaneous there can be no recovery under such a statute for pain and suffering').

Several of the witnesses at the trial in this Court testified that the French au-

---

ety and comfort experienced by Cyrus Elahi's brothers, the Court finds that there was an absence of specific testimony regarding mental anguish and loss of society and comfort experienced by his sister. In addition, while in his younger years, after the divorce of his parents and 21 years prior to his death, Cyrus was a father figure to all his siblings, there was insufficient evidence about the state of

Cyrus Elahi's relationship with his sister at the time of his death. *See Flatow,* 999 F.Supp. at 30 (requiring proof of close emotional relationship before awarding damages to siblings). Therefore, there will be no award of damages for anguish or loss of society and comfort suffered by Cyrus Elahi's sister. No award was requested on behalf of any other family member.

thorities found pieces of flesh and blood under Cyrus Elahi's fingernails. They also testified that a witness reported seeing a man fleeing the scene with blood on his jacket. Mr. Boedels testified that Cyrus Elahi was shot seven times. Dr. Ganji testified that a neighbor reported seeing two men struggling. Finally, Dariush Elahi testified that his "memory [from speaking with French police] is that it could have been for a period of as much as three or four minutes that [Cyrus Elahi and his assassin] were struggling before he was hit in the head twice." Tr. 226. This uncontroverted evidence demonstrates, at a minimum, that Cyrus Elahi was aware of what was happening to him for long enough to grab hold and scratch his assailant. From this, the Court can infer that Cyrus Elahi suffered a period of pain and suffering. But, although it is possible that the struggle "could have been for a period of as much as three or four minutes," the evidence does not demonstrate that the struggle actually did last for any significant length of time. At trial, the Court asked Mr. Boedels (who had the most extensive access to the French investigation) the following:

> The Court: Was there anything indicated in the police report, in the autopsy report, or from any other source that you know of, sir, that indicated how long it was from the time that any one or all of these seven bullets struck him to the time that he actually died? What was the interval? Are we talking hours? Are we talking seconds? Are we talking minutes? If so, how long? Anything that tells us that?
>
> Mr. Boedels: No, there is no evidence, Your Honor, there is no evidence. But I must say that it would have taken, let us say, at least something like 30 seconds, to my opinion. And 30 seconds with people who are willing to kill you, it's a very long delay.

Tr. 139. Notwithstanding Mr. Boedel's (and other witnesses') speculation, there was no significant evidence offered at trial from which the Court could find that Cyrus Elahi suffered for more than a very short period of time. The Court must take this into account in determining damages for pain and suffering.

In sum, the Court holds that distress endured prior to the assassination is not compensable damage. In addition, the Court can only find that Cyrus Elahi's pain and suffering lasted a very brief period of time. Consequently, the Court will award a sum for pain and suffering which is far below the amount requested by the plaintiff. The Court concludes that the appropriate amount of compensation for pain and suffering of the decedent is $1,000,000.

### III. Count III—Punitive Damages

One of the main purposes of the Antiterrorism Act is to provide victims of state sponsored terrorism (or, as in this case, the next-of-kin and personal representative) "an important economic and financial weapon against these outlaw states." H.R.Rep. 104–383, at 182–183. In order to achieve this purpose, the statute allows for the imposition of punitive damages for any action brought pursuant to the Flatow Amendment. 28 U.S.C. § 1605 note.

Because the plaintiff has established subject matter jurisdiction under section 1605(a)(7), punitive damages may be awarded against MOIS, which has been found to be an "agency or instrumentality of a foreign state," i.e., the Islamic Republic of Iran. 28 U.S.C. § 1606. *See also Flatow*, 999 F.Supp. at 26; *Anderson*, 90 F.Supp.2d at 113. Punitive damages may not, however, be awarded against the Islamic Republic of Iran. The FSIA exempts a foreign state from liability for punitive damages.[17] *See* Victims of Trafficking and

---

**17.** The plaintiff seeks punitive damages against Iran under two theories: First, the plaintiff argues that punitive damages may be awarded against Iran vicariously based on a theory of respondeat superior. The *Flatow* court accepted this argument. *See Flatow*,

Violence Protection Act of 2000, P.L. No. 106–386, § 2002(f)(2) (October 28, 2000) (repealing recently enacted amendment to 28 U.S.C. § 1606 permitting punitive damages against a foreign state for actions under sections 1605(a)(7) and 1610(f)). *See Anderson*, 90 F.Supp.2d at 114; *Cicippio*, 18 F.Supp.2d at 69.

The purpose of punitive damages is "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future." RESTATEMENT (SECOND) OF TORTS § 908(1) (1997). Courts faced with gross violations of international human rights have employed the tool of punitive damages to achieve these dual purposes. By granting sizeable awards, courts have recognized the condemnation of the community of nations of human rights abuses. *See Alejandre* 996 F.Supp. at 1250. Punitive damages are said to help reinforce "the consensus of the community of humankind." *Filartiga v. Pena–Irala*, 577 F.Supp. 860, 863 (E.D.N.Y.1984). And, as stated in *Anderson v. Islamic Republic of Iran*, "[t]he victim to whom the award is made ... stands as a surrogate for civilized society in general; the victim is made more than whole in order that others may be spared a similar injury." 90 F.Supp.2d at 114.

The assassination of Cyrus Elahi by agents of MOIS for his outspoken criticism of the Iranian regime was intentional, premeditated, malicious, and cruel. Such an act violates fundamental precepts of international law that are binding on all members of the world community. This is reason enough justify the substantial punitive damages awarded on this date against the defendant MOIS. Another reason one

could award punitive damages in this case is to recognize society's interest in the free expression of political ideas. *Cf. Anderson*, 90 F.Supp.2d at 114 (justifying award of punitive damages on basis of "vindicat[ing] the interest of society at-large in the collection and dissemination of complete and accurate information about world conflicts").

Dr. Patrick Clawson testimony regarding Iran's expenditures on terrorism was illuminating. Dr. Clawson estimated that the MOIS expended between $50 million to $200 million on eliminating political opponents of the regime. As he has in previous cases, Dr. Clawson testified that Iran is aware of the recent court judgments. He also testified that it would be consistent with Iran's prior behavior for Iran to alter its behavior so as not to target Americans. To achieve these goals, the Court finds it appropriate and necessary to award $300,000,000.00 against the defendant MOIS.

## CONCLUSION

The plaintiff has established to the Court's satisfaction, pursuant to 28 U.S.C. § 1608(e), that the defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security, engaged in an act of extrajudicial killing of a United States national by ordering, directing and arranging for the assassination of Cyrus Elahi. Accordingly, for the reasons more fully set forth above, the defendants are judged liable for the assassination or Dr. Elahi under the provisions of the FSIA. Except for punitive damages, the defendants are jointly and severally liable for all damages flowing from that unlawful act as

---

999 F.Supp. at 25–27. Second, the plaintiff argues that Iran can be held jointly and severally liable for punitive damages with MOIS based on Count IV of the complaint—a conspiracy claim. The Court rejects both of these arguments. Congress recently repealed legislation that would have permitted punitive damages against a foreign state is cases, such as this one, brought under 28 U.S.C.

§ 1605(a)(7). *See* P.L. No. 106–386, § 2002(f)(2). In so doing, Congress returned the law to its pre–1998 state, when it provided that a "foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages...." 2 U.S.C. § 1606. Congress' intention is clear. Punitive damages are not available against a foreign state.

awarded by this Court in the following amounts:

Monetary Damages for Wrongful Death
Loss of Accretion to the Estate of
Cyrus Elahi $ 725,359
Funeral Expenses to the Estate of
Cyrus Elahi $ 14,676
Solatium—Dariush Elahi $ 5,000,000
Solatium—Elham Elahi $ 5,000,000

Survival Damages (Pain and suffering of decedent) $ 1,000,000
Punitive Damages $300,000,000

The Clerk of the Court shall enter judgment accordingly. An Order accompanies these Findings of Fact and Conclusions of Law.

IT IS SO ORDERED.