Leah S. MOUSA, Plaintiff,

v.

The ISLAMIC REPUBLIC OF IRAN, et al., Defendants

No. 00–2096(WBB).

United States District Court, District of Columbia.

Sept. 19, 2001.

John W. Karr, Karr & Allison, P.C., Washington, DC, for Plaintiff.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRYANT, District Judge.

This action arises from an act of state-sponsored terrorism by a foreign state officially designated by the U.S. Department of State to be a state sponsor of terrorism. Defendants have not entered an appearance in this matter. This Court entered default on December 26, 2000, pursuant to 28 U.S.C. § 1608(d) and Fed.R.Civ.P. § 55(a). As with actions against the federal government, the Foreign Sovereign Immunities Act (FSIA) requires that a default judgment against a foreign state be entered only after a plaintiff "establishes his claim or right to relief by evidence that is satisfactory to the Court." 28 U.S.C. § 1608(e); *see also Flatow v. Islamic Republic of Iran, et al.,* 999 F.Supp. 1, 6 (D.D.C.1998).

Plaintiff has brought this action pursuant to the FSIA, which establishes federal court jurisdiction over foreign states and their officials, agents and employees in certain enumerated instances. In particular, the FSIA creates a federal cause of action for personal injury or wrongful death resulting from acts of state-sponsored terrorism. *See Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27 (D.D.C.2001); *Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38 (D.D.C. 2000); *Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27 (D.D.C.2001); *Elahi v. Islamic Republic of Iran,* 124 F.Supp.2d 97 (D.D.C.2000); *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d 1 (D.D.C. 2000); *Anderson v. The Islamic Republic of Iran,* 90 F.Supp.2d 107 (D.D.C.2000); *Cicippio v. The Islamic Republic of Iran,* 18 F.Supp.2d 62 (D.D.C.1998); *Alejandre v. Republic of Cuba,* 996 F.Supp. 1239 (S.D.Fla.1997).

## I. Findings of Fact

The Court heard testimony on September 4 and 5, 2001. Plaintiff proceeded in a bench trial, and the following findings of

fact are based on the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence. Plaintiff has "established [her] claim or right of relief by evidence that is satisfactory to the Court," as required by 28 U.S.C. § 1608(e). The Court finds the following facts to be established by clear and convincing evidence, which would have been sufficient to establish a prima facie case in a contested proceeding:

(1) Plaintiff Leah S. Mousa is an American citizen who was born and raised in New York; she currently lives in Israel with her husband.

(2) On February 25, 1996, Ms. Mousa boarded the Number 18 Egged bus in Jerusalem, Israel, and was on that bus when it was bombed by a terrorist.

(3) At or about 6:45 a.m., as the bus came to a stop on Jaffa Street at its intersection with Sarae Yisrael Street, Magid Warda, a passenger on the bus, detonated explosives which, at the direction of HAMAS, he had carried onto the bus concealed in a travel bag, resulting in a complete destruction of the bus, the deaths of 25 people and severe injuries to 11 others, including the plaintiff. Shrapnel and debris were scattered for more than 100 yards.

(4) HAMAS immediately claimed credit for bombing the bus, a claim that was verified in confessions and other statements to Israeli police by Hassan Salameh, the HAMAS member who planned and organized the attack. Mr. Salameh later corroborated HAMAS' responsibility for the attack in an interview broadcast on a CBS Television News Program, *60 Minutes.*

(5) HAMAS, the popular name for the Islamic Resistance Movement, is an organization supported by the defendant, Islamic Republic of Iran ("Iran") and dedicated to the waging of *Jihad,* which means "holy war" employing terrorism, with the objective of seizing the leadership of the Palestinian people and asserting sovereignty and the rule of its version of the Muslim religion over all of Palestine, which HAMAS contends includes all of the territory of the State of Israel.

(6) Iran supports terrorist and other activities of HAMAS, in monetary amounts ranging between $50 and $100 million per year, and did so prior to and at the time of the February 25, 1996, bombing at issue in this action. Iran saw an opportunity to disrupt the Israeli–Palestinian peace process then under way through terrorist actions. Iran has been identified both by Israel and by the Palestinian Liberation Organization as an instigator and supporter of terrorist activity, including the bombing in this case. Iran encourages terrorism, *inter alia,* through public statements by government representatives at weekly prayer meetings carried on Iranian television and reported in the Iranian press, encouraging and commending terrorist actions as important to the worldwide Muslim cause. Iran has characterized Israel and the United States as "satanic" and has expressly targeted both countries as the principal enemies of its cause. Iran published and broadcast threats of further bomb violence, between the February 25, 1996, bombing involved in this action and a second bombing by HAMAS of a Number 18 Egged bus on the same bus line exactly one week later, on March 4, 1996.

(7) The testimony of Dr. Reuven Paz and Dr. Patrick Clawson established conclusively that Iran and the other defendants knew of the destructive purposes and objectives of HAMAS, which were set forth in detail in the *Charter of Hamas,* introduced into evidence as plaintiff's Exhibit 9.

(8) The conclusions of Dr. Paz and Dr. Clawson that Iran had provided material support for the terrorist activities of HAMAS was confirmed by the statements and confessions of Hassan Salameh to the Israeli police after his capture and to a CBS reporter during a *60 Minutes* interview in which Mr. Salameh appeared relaxed and satisfied with his supervision of the murders of 50 people and substantial injuries to dozens more. In his confessions and explanatory statements, Mr. Salameh explained that after joining HAMAS, he was sent to Iran, via Sudan and Syria, where he was transported by Iranian aircraft to a military base near Tehran that was garrisoned and operated by the Iranian Revolutionary Guards. Osamah Hamdan, the official representative of HAMAS in Iran, met him in Tehran. For three months, Mr. Salameh was trained at that military base by Iranian military instructors, assisted by translators, in the use of explosives, automatic weapons, hand grenades, use of R.P.G. and L.A.W. missiles, terrorist methods of ambush, deactivation of land mines for extraction of explosive material, and trigger mechanisms for various explosive devices. He sketched out two such mechanisms, one of which was used in an operation at Gush Qatif in the Gaza Strip in 1995. According to his statements, all of his training in the use of explosives was provided in Iran by members of the Iranian military. Mr. Salameh also noted meeting in Iran with Mohammed Deif, commander of the military, terrorist wing of HAMAS. Following completion of his training in Iran, Mr. Salameh was sent back to Israel to carry out the series of terrorist attacks to which he confessed, including the explosion of the Number 18 Egged bus on February 25, 1996.

(9) Defendant, Islamic Republic of Iran, is a foreign state and has been designated a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979, 50 U.S.C.App. § 2405(j) continuously since January 19, 1984. Dr. Clawson testified that Iran was, in February, 1996, and is today, the principal state sponsor of terrorism in the world.

(10) Dr. Paz and Dr. Clawson testified that defendants Ayatollah Ali Hoseini Khamenei, Ali Akbar Hashemi–Rafsanjani, and Ali Fallahian–Kuzestani were high officials of Iran on February 25, 1996, whose knowledge and approval would have been necessary to carry out Iran's financing and support of HAMAS and Iran's training of HAMAS terrorists in Iran.

(11) Defendant, The Iranian Ministry of Information and Security, is the Iranian intelligence service, functioning both within and beyond Iranian territory. Acting as an agent of Iran, the Iranian Ministry of Information and Security performed acts within the scope of its agency, within the meaning of 28 U.S.C. § 1605(a)(7) and 28 U.S.C.A. § 1605 note, which caused the severe injuries to Ms. Mousa, in that this defendant acted as a conduit for Iran's provision of funds to HAMAS and training to the terrorists, including Hassan Salameh.

(12) The injuries to Ms. Mousa were caused by a willful and deliberate act of terrorism, not authorized by a court judgment, in that those injuries were the result of an explosion of a bomb carried aboard the Number 18 Egged bus on February 25, 1996, and intentionally detonated by Majid Warda at approximately 6:45 a.m., acting under instructions from Hassan Salameh, who was acting as an official and agent of HAMAS. This bombing would not have occurred but for the encouragement, involvement and assistance of Iran.

(13) As a result of the explosion, Ms. Mousa was thrown approximately 25 feet from the bus onto the opposite side of the intersecting streets. Most of her face and

parts of her body were burned, and her face was covered with blood, broken glass and debris. She remembers experiencing extreme terror immediately before the explosion, when a young man on the bus rose and yelled Allah Akbar ("God is great"). She has a memory from the moment of explosion of the extreme, searing pain associated with the shattering of both eardrums, and described it as the worst pain she could imagine.

(14) Ms. Mousa's body was found by paramedic David Sofer. Thinking she was dead due to the appearance of her external injuries and lack of movement, he turned from her to determine which of the other victims needed immediate attention, when a movement of Ms. Mousa caught Mr. Sofer's attention and he rushed to her assistance.

(15) Ms. Mousa's breathing was irregular, prompting Mr. Sofer and another paramedic to attempt to insert a tube in Ms. Mousa's throat to help her breathe, but they were unable to do so. Ms. Mousa was not conscious and was not responsive to the paramedics' instructions. The paramedics placed her into an ambulance and began driving her to a hospital.

(16) On the way to the hospital, Ms. Mousa's face and nose were covered with so much blood that Mr. Sofer concluded that it was useless to put an oxygen mask on her, and he abandoned efforts to do so.

(17) Mr. Sofer realized Ms. Mousa was gasping for air, and concluded that she would not survive the journey to Hadassah Medical Center, a teaching hospital equipped to treat head trauma, so he instructed the ambulance driver to head to a closer hospital, Shaare Zedek Medical Center ("Shaare Zedek").

(18) On admission to Shaare Zedek, Ms. Mousa's burned and bloody face was disfigured beyond recognition. She was diagnosed to have suffered burns to her face and much of her body; blast injuries to her lungs; fractures to the base of the cranium, including fractures of the maxillary mandibular and ethmoid bones; lacerations of her left eye; lacerations to her right hand, including the severing of tendons; ruptured ear drums; nerve damage around her mouth and to the left side of her face; and multiple other less life-threatening injuries. She had excruciating pains in her ears and was deaf, and she could not see. She was near death twice in the emergency room. Immediate surgery on her left eye was performed because it was full of glass and shrapnel, and there was discussion among the medical staff of possible removal of the eye.

(19) Ms. Mousa's first memories in the hospital were of lying in her hospital bed, trying to hold herself together physically, fearing that if she did not do so, she would literally fall apart. She was fearful at all times, and was terrified and for months refused to look at herself in a mirror.

(20) She was eventually moved to the Intensive Care Unit (ICU) to deal with the severe blast injuries to her lungs, and shortly thereafter, her lungs collapsed, and once again, Ms. Mousa was on the verge of death. A breathing tube was inserted; she was placed on a respirator for the next couple of weeks, after which an oxygen mask mechanism was placed on her face that she wore continuously until a week after she had returned home.

(21) Ms. Mousa remained at the hospital for 19 days. At discharge, she continued to suffer severe pain from her multiple injuries, particularly the burns to her face and body. She regained some hearing-aid assisted hearing and sight in her right eye. She remained unable to stand or ambulate except by wheelchair.

(22) Ms. Mousa was transferred from the hospital to Lenore's Rehabilitation

Center, where she remained for 9 days, relearning how to walk and perform basic functions. However, for the most part, Ms. Mousa was not able to walk, and was bedridden and unmoving—"frozen," in her words—except to go to the bathroom with assistance.

(23) Ms. Mousa returned home on March 23, 1996, where she was cared for by an attendant and by her husband for eight days, until March 31st, when she was rushed back to Shaare Zedek because a blood clot had formed in her left leg, a condition related to her injuries and treatment. She remained hospitalized for an additional seven days, and was again discharged to the care of her husband and the attendant, on April 6th. The attendant remained at her home until April 14th, when Ms. Mousa began walking with the assistance of a walker, which she required until May 7th, when she changed to a cane.

(24) Ms. Mousa attended physical rehabilitation sessions three times a week for six weeks at the Caped Holim Clinic, each session lasting seven hours, from 7:00 a.m. to 2:00 p.m., which ended in mid-June, 1996.

(25) Because of the blood clot, Ms. Mousa was required to have weekly blood tests for a year and, thereafter, semi-annual blood tests—including ultra sound and Doppler—to screen her blood flow for clotting.

(26) Although the trip to the health clinic for blood testing was ordinarily a ten-minute walk from Ms. Mousa's house, for much of the first year it took her an hour to make that trip. She had incredible physical difficulty putting one foot in front of the other.

(27) On November 4, 1996, Ms. Mousa was re-admitted to Shaare Zedek for eye surgery to remove a traumatic cataract caused by the explosion.

(28) As a proximate result of her injuries, Ms. Mousa suffered from intense physical pain for more than three months, and from diminishing pain for many months thereafter. She continues to suffer pain.

(29) The explosion left Ms. Mousa a total loss of unaided hearing; blindness in her left eye, which has also shrunk and sunken into an aesthetic disfigurement; damage to nerves around her eyes; damage to the nerves around the left side of her mouth, to the extent that the areas around her mouth are numb and unfeeling; burn scars on her face, arms and legs; damage to the tendons in her right hand, to the extent that she cannot bend her right hand, her fingers are without sufficient strength to hold common objects, and she experiences intermittent pain extending from her hand up the length of her arm. Ms. Mousa's dominant hand was her right hand, and the damage to this hand has forced her to rely on her left hand. She continues to experience persistent difficulty walking. Her balance has been grossly affected, and when tired, she cannot walk in a straight line because she is unable to focus on walking when she lacks energy or attention.

(30) As a proximate result of the bombing, Ms. Mousa suffers from an inability to concentrate; from flashbacks that make her very frightened; from an aversion to visiting the hospital, being examined by a doctor, or touched at all; from fear of walking down stairs; from fear of riding buses; from a marked decrease in sexual closeness with her husband; from extreme fear and inconvenience in crossing streets, especially at night; from frequent bouts of anger and fear; and from a constant loss of joy and pleasure with all of the things she previously enjoyed in life.

(31) Because of the loss of sight in her left eye and the damage to her right hand,

Ms. Mousa can no longer pursue her career as an artist painting in acrylics, an activity to which she had devoted some 30 hours a week and in which she had begun to achieve recognition in the community of artists in which she practices her art; not long before the bombing, her art was organized and shown in exhibition.

(32) Since the bombing, Ms. Mousa has suffered from severe mental anguish, resulting in a condition known as Post Traumatic Stress Disorder (PTSD). The testimony of Dr. Arieh Shalev, Chief of Psychiatry at Hadassah University Hospital, who evaluated Ms. Mousa, has convincingly demonstrated, to a reasonable degree of medical certainty, that Ms. Mousa suffers from chronic PTSD, and is thus permanently injured. Dr. Shalev identified a series of symptoms from which Ms. Mousa suffers which render her highly disabled as a consequence of PTSD. In Dr. Shalev's opinion, at almost six years following the bombing, the likelihood of remission of Ms. Mousa's disabling condition is zero.

(33) Dr. Edgar Garcia–Rill, a recognized expert in PTSD and its neurobiological consequences, described the leading causes of PTSD, its symptoms and its physiological effects on the brain and its functions. Dr. Garcia–Rill explained that Ms. Mousa's score of 85 on the CAPS test administered by Dr. Shalev (the accepted medical procedure for diagnosing PTSD) was a very high score, contrasting it with scores between zero and ten which would be typical of persons without PTSD. Dr. Garcia–Rill offered the opinion, and the court finds, that Ms. Mousa suffers from severe chronic PTSD.

(34) Among the principal causes of PTSD identified by Dr. Garcia–Rill are a traumatic, violent event accompanied by severe physical injuries, as Ms. Mousa suffered. In the majority of cases of PTSD, the disorder is brought on by sudden injury. Dr. Garcia–Rill testified that statistical research has clearly established that women are twice as likely to develop PTSD as men.

(35) Ms. Mousa suffered from a skull fracture, among other injuries. According to Dr. Garcia–Rill, trauma to the skull is known to induce traumatic brain injury, and its effects on brain function. Any traumatic head injury which results in loss of consciousness produces physical injury to the brain, which likely will result in permanent injury, including loss of memory for traumatic events, disorientation or confusion, and some neurological deficits, including attention problems. In Dr. Garcia–Rill's opinion, it is reasonably certain in light of Ms. Mousa's head injuries and her continuing symptoms that she suffers from traumatic brain injury whose effects are permanent.

(36) Ms. Mousa has recurring experiences in which she relives the bus bombing as though it were happening again and again, causing her extreme anguish. Dr. Garcia–Rill testified that PTSD results in the exaggeration of trauma-related memories.

(37) Dr. Shalev testified that Ms. Mousa periodically is reminded of the bombing by some stimulus, such as an ambulance siren or a news report. These stimuli likewise trigger memories of the bombing that cause incapacitating distress that renders her unable to continue with the activities at hand. In such circumstances, she experiences sweating or shortness of breath.

(38) Ms. Mousa suffers from frequent nightmares related to the bus bombing that occur approximately twice weekly, causing her distress. She also suffers from chronic sleep disturbances, including difficulty falling and remaining asleep. Dr. Garcia–Rill testified that sleep distur-

8

bances are typically present in those who suffer from PTSD, which affects the ability to sleep without waking or without nightmares, and causes an inability to fall asleep; all such afflictions affect metabolic balances in the brain and, if prolonged and unresolved, lead to cognitive disfunction, motor disturbances and psychotic events. Drs. Shalev and Garcia–Rill agreed that Ms. Mousa's afflictions were not likely to resolve.

(39) Dr. Shalev testified that in examining Ms. Mousa as the bombing was discussed, she became flooded with memories with which she was uncomfortable. She experiences such memories daily, and several times a week she is flooded with memories of the bombing which cause her severe distress and strongly dissociative symptoms, interfering with her ability to concentrate to the extent necessary, for example, to carry on a conversation or to complete a simple task.

(40) Dr. Garcia–Rill testified that Ms. Mousa's symptoms of dissociation, which are common in persons with PTSD, pervade her perception of the bombing and that this perception clearly signals a negative prognosis for her ability to recover.

(41) Dr. Shalev testified that Ms. Mousa is emotionally numb and has a sense of pessimism and fatalism about the future. She suffers from a lack of interest in planning for the future. Dr. Shalev characterized these symptoms as features of a moderate, chronic depression from which Ms. Mousa continues to suffer.

(42) Ms. Mousa suffers from irritability and strong feelings of anger of moderate intensity at least once or twice per week. Dr. Garcia–Rill explained that such symptoms in PTSD sufferers are caused by physiological changes in the brain which impair the ability to control emotional responses.

(43) Ms. Mousa has suffered a severe loss of ability to concentrate, even with intense effort. Dr. Shalev testified that this condition is particularly troublesome for anyone who must read or perform routine tasks such as clerical work (noting that Ms. Mousa had previously engaged in those activities), because such a markedly low level of concentration prevents the reading of an entire paragraph or completion of a task without forgetting the beginning of the paragraph or task.

(44) Dr. Garcia–Rill testified that PTSD results in deficits in attentional mechanisms, including short-term memory. These deficits in attention are due to small hippocampal volumes, a deficiency in that part of the brain that participates in learning and memory and orientation in space. Ms. Mousa testified that she has considerably difficulty with short-term memory.

(45) Ms. Mousa suffers from a constant state of alertness and watchfulness. Dr. Shalev observed and concluded that she has a profound fear that danger still surrounds her and she cannot escape it. This condition prevents her from ever relaxing and thereby being able to relieve or have any respite from the distress and anxiety that are part and parcel of all of her experiences. Dr. Garcia–Rill testified that such symptoms are typical of persons suffering from the three distinct injuries suffered by Ms. Mousa, PTSD, brain injury and depression.

(46) Ms. Mousa's hyper-vigilance and inability to control responses to startling occurrences, were echoed and corroborated in the testimonies of Phyllis Rosenbaum and Anita Good, who are close friends and associates of Ms. Mousa. They testified, and the court finds, that Ms. Mousa is constantly tense, shaky and fearful, conditions that were not present before the bombing. They testified to instances when Ms. Mousa would hear a loud noise, like an

explosion, and would be visibly shaken for some time afterwards.

(47) Dr. Garcia–Rill explained that an important characteristic of PTSD is an exaggerated startle response and an inability to habituate to repetitive startling stimuli, *viz.*, the PTSD victim is unable to remember how to respond to startling stimuli and thus loses the capacity to respond rationally to a situation. This is called a sensory gating deficit, in which all cognitive functions suffer from increased distractibility, a process that negatively affects, for example, the ability to respond to fight-or-flight responses.

(48) Ms. Mousa testified that she is often fatigued, and Ms. Rosenbaum and Ms. Good both agreed that Ms. Mousa's energy level is markedly lower than it was before the bombing, and that Ms. Mousa has nowhere near the strength and energy for work or social activities that she had before the bombing.

(49) Ms. Good testified that Ms. Mousa is a much different person that she was before February 25, 1996: she is not as adventurous; she is much more vulnerable and fragile; she avoids looking at herself in mirrors because her changed appearance is a reminder of the bombing and its effects on her.

(50) Ms. Mousa regularly and actively avoids reminders of the bombing, including activities and places that she is afraid she will associate with the bombing. She makes efforts to repress thoughts and memories of it, and to deny its effects on her. The testimony of Ms. Rosenbaum and Ms. Good corroborated these problems; Ms. Good explained how Ms. Mousa constantly fights against feeling like or being identified as a "patient" or "invalid." Dr. Shalev confirmed that Ms. Mousa suffers from these characteristic symptoms of PTSD.

(51) Dr. Garcia–Rill testified that because Ms. Mousa is severely symptomatic after five years, it is highly probable that her PTSD condition is permanent. PTSD is exacerbated by the multiplicity of stressors from which Ms. Mousa has suffered since its origin. Those stressors, combined with the depression and traumatic brain injury with which she also suffers, exacerbate her concentration and memory problems. In addition, her affected brain systems will likely produce persisting episodes of hyper vigilance, sleep disturbances, exaggerated startle response, decreased sensory gating, increased distractibility and decreased critical judgment (especially under stress), all of which has led Dr. Garcia–Rill to conclude that Ms. Mousa will have a seriously flawed and limited future. Dr. Garcia–Rill explained that, unlike other neurological and psychological conditions, it is extremely unlikely that a single drug will be developed or identified that will ameliorate the combined consequences of PTSD, brain injury and depression from which Ms. Mousa suffers.

(52) Dr. Garcia–Rill described other physical consequences of PTSD which may likely afflict Ms. Mousa in the future. He explained that a majority of PTSD sufferers have shorter life-spans; experience major depression; have greatly increased susceptibility to diseases of the heart, and of the circulatory, digestive, musculoskeletal, endocrine, and nervous systems; are at greater risk for myocardial infarction, diabetes, multiple sclerosis, atherosclerosis, and rheumatoid arthritis; and that PTSD chronically impairs the normal functioning of the immune system. Moreover, he testified, many diverse illnesses and stressors can reactivate the more severe symptoms of PTSD. He described Ms. Mousa's condition as far worse than being routinely subjected to ordinary stresses of

life, and that, little by little, in his opinion, it will likely kill her.

(53) Dr. Shalev described Ms. Mousa as a strong person with a highly defensive style of dealing with PTSD. He testified that to defend herself against PTSD's effects, Ms. Mousa tries not to think about the bombing, attempts to deny it, and works to avoid and repress thoughts about it. He described this process as her unsuccessful effort to master the feelings of terror and helplessness caused by the bombing. He warned that if something were to disrupt any part of her defensive system, for example, a change in the support she receives from her husband, her friends and others, her condition could become much worse, and she could fall apart. Ms. Rosenbaum's metaphor described Ms. Mousa as being like a shattered windshield, holding the fragments of herself together by force of will but susceptible to crumbling at any time.

(54) Dr. Shalev offered the opinion, and the court finds, that Ms. Mousa's PTSD condition is severe and permanent, and will continue to severely affect all aspects of her life and vocational pursuits, and to cause her misery from which she will have no respite for the remainder of her life.

## II. CONCLUSIONS OF LAW

### A. The Foreign Sovereign Immunities Act Controls This Action.

■ As this Court noted in *Flatow*, an action brought against a foreign state, its intelligence service acting as its agent, and three of its officials, acting in their official capacities, must be brought under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602–1611. *Flatow*, 999 F.Supp. at 10; *see also Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 36

(D.D.C.2001). Indeed, the FSIA must be applied in every action involving a foreign state defendant. 28 U.S.C. § 1330; *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 489, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). That is, the sole basis for subject matter jurisdiction in an action against a foreign state defendant are the FSIA's enumerated exceptions to immunity. *Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 24 (D.D.C.2001). Accordingly, this Court lacks jurisdiction over this matter unless it falls within one of the FSIA's enumerated exceptions to foreign sovereign immunity. 28 U.S.C. § 1330(a). *See also Daliberti v. Republic of Iraq*, 146 F.Supp.2d 19, 24 (D.D.C.2001); *Elahi v. Islamic Republic of Iran*, 124 F.Supp.2d 97 (D.D.C.2000) (opinion, at 18).[1]

■ The FSIA has been construed to apply to individuals for acts performed in their official capacity on behalf of either a foreign state or its agency or instrumentality. 28 U.S.C. § 1605(a)(7) (the "Flatow Amendment"); 28 U.S.C. § 1605 note; *Elahi*, 124 F.Supp.2d 97 (opinion, at 19); *Flatow*, 999 F.Supp. at 12–13. Specifically, Congress amended the FSIA to create an exception to the immunity of those foreign states officially designated as state sponsors of terrorism by the Department of State, if the foreign state so designated commits a terrorist act, or provides material support and resources to an individual or entity which commits such a terrorist act, which results in the death or personal injury of a United States citizen. *See* 28 U.S.C. § 1605(a)(7); *Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1, 8 (D.D.C.2000). Based on the foregoing authority and findings, the Court concludes that it has jurisdiction over the subject matter of this action.

---

**1.** Plaintiff has submitted a copy of the original opinion in *Elahi* as filed by the District Court, at tab 4 of Plaintiff's Trial Binder. Page citations are to this version of the opinion.

### B. Personal Jurisdiction

■ This Court has *in personam* jurisdiction over foreign state sponsors of terrorism under 28 U.S.C. § 1605(a)(7). As was noted in *Flatow,* the FSIA provides that personal jurisdiction over defendants will exist where a plaintiff establishes the applicability of an exception to immunity pursuant to 28 U.S.C. §§ 1604, 1605, or 1607, and service of process has been accomplished pursuant to 28 U.S.C. § 1608. *See Flatow,* 999 F.Supp. at 19; *Eisenfeld v. Islamic Republic of Iran,* 172 F.Supp.2d at 8. Plaintiff has here demonstrated by clear and convincing evidence that § 1605(a)(7) of the FSIA applies in this action, and service of process was accomplished with the assistance of Swiss Embassy in Tehran. A court must also determine whether the notice provided by service under § 1608 passes constitutional muster. *Flatow,* 999 F.Supp. at 19; *Cicippio,* 18 F.Supp.2d at 67 n. 4. Based on a careful review of the pleadings of record in this action, including the complaint, summons, notice of suit, and the certified translations, the Court finds that the notice given to defendants was legally sufficient.

### C. The Actions of Defendants

Under the FSIA, a foreign state may be liable when there is injury from a terrorist act that was perpetrated by the designated state or an agent receiving material support from the designated state, when the provision of support was an act authorized by the foreign state, when the foreign state has been designated as one providing material support to terrorism, and when either the victim or the plaintiff was a United States national at the time of the terrorist act. 28 U.S.C. § 1605(a)(7); 28 U.S.C. § 1605 note.

The action of the HAMAS agent in detonating the bomb on the Number 18 Egged bus on February 25, 1996, falls within the proscriptions of the Torture Victim Protection Act of 1991, 28 U.S.C. § 1350 note, which applies, *inter alia,* to "... any act ... by which severe pain or suffering is intentionally inflicted on [an] individual ..."

■ There is no question that HAMAS and its agents received massive material and technical support from the defendant, Islamic Republic of Iran. The sophistication of such a process demonstrated in the use of a relatively small explosive charge with such devastating effect indicates that it is unlikely that this attack could have resulted in such injuries and loss of life without the assistance of military forces, such as those of Iran by whom the bomber was trained. Finally, Iran was, as of February 25, 1996, a nation designated by the United States Department of State as providing material support for terrorism, and Leah Mousa was an American citizen at the time of the bus attack on February 25, 1996.

It is also a fact that if officials of the United States, acting in their official capacities, provided material support to a terrorist group to carry out an attack of this type, they would be civilly liable and would have no defense of immunity. 42 U.S.C. § 1983; *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

### D. Damages

(1) *Claims Excluded.* Plaintiff makes no claim for past or future lost earnings, nor for reimbursement for medical expenses because of all such expenses were satisfied under the Israeli national health care system. No claim is made for solatium: Ms. Mousa has no children, her parents are deceased, and her husband is not

an American national and, thus, has no standing to make such a claim.

(2) *Pain and Suffering.* Ms. Mousa suffered extensive and permanent losses of sensory perception, disfigurement and extraordinary conscious pain and suffering, as proximate results of the bus bombing:

a. She suffers from blindness in her left eye, a permanent condition;

b. Her life span has been shortened by approximately 6 years;

c. She suffers from deafness in both ears, a permanent condition;

d. She suffers from destruction of tendons and substantial loss of the use of her right hand, a permanent condition, with resulting chronic pain in her hand and arm;

e. She suffered from extensive burns to her face and body, with permanent disfiguring effects;

f. She suffered from cranial fractures, with resulting permanent brain injury;

g. She suffered from lacerations to the face and eyes, caused by shrapnel, glass, and impact, with resulting permanent nerve damage, scarring, shrinkage and recession of her left eye, and other cosmetic damage;

h. She suffered from lung blast injury, with resulting permanent impairment of breathing;

i. She has suffered from the disabling condition of Post Traumatic Stress Disorder for the past five and a half years, and is convincingly projected to suffer its disabilities for the reminder of her life. This disorder has caused her great mental anguish in the form of flashbacks and nightmares of the bombing, physical impairments and limitations, irritability and anger; constant fear; depression; loss of enjoyment of life; and loss of hope for her future.

The severity of her injuries necessitated hospitalization, multiple surgeries, treatments, and immobilization, over a continuous period of four months, and periodically thereafter, in the course of which she experienced the extremes of physical pain associated with such horrible injuries.

The determination of just compensation for Ms. Mousa's damages can be guided by recent precedents in this court. Previous awards of compensatory damages in Iranian-sponsored terrorist cases provide some guidance. *See Eisenfeld, et al. v. Islamic Republic of Iran, supra* (total compensatory damages of $27,161,002, including $1,000,000 each for "several minutes" of pain and suffering of two decedents who died at the scene of the same bombing as is at issue in the instant case); *Flatow v. Islamic Republic of Iran, supra* (total compensatory damages of $22,513,220, including $1,000,000 for 3 to 5 hours of pain and suffering); *Elahi v. Islamic Republic of Iran, supra* (total compensatory damages of $11,740,035, including $1,000,000 for 3 or 4 minutes of pain and suffering). Each of these judgments involved awards to the estates of decedents who were killed by terrorist actions.

Also instructive are decisions by this court analogous to Ms. Mousa's condition as a survivor involving awards to other survivors of Iranian sponsored terrorism. *See Sutherland v. Islamic Republic of Iran, supra* ($46,540,000 for wrongful imprisonment, torture and kidnaping); *Anderson v. Islamic Republic of Iran, supra* ($41,240,000 for wrongful imprisonment, torture and kidnaping); *Jenco v. Islamic Republic of Iran, supra* ($14,640,000 for wrongful imprisonment); *Cicippio, et al. v. Islamic Republic of Iran, supra* ($30,000,000, $26,000,000 and $9,000,000 to each of three plaintiffs who were wrongfully imprisoned for 63, 44 and 18 months,

respectively); *Daliberti, et al. v. Islamic Republic of Iraq, supra* ($4,235,441, $2,942,285, $3,848,559 and $1,797,004 to each of four plaintiffs who were wrongfully imprisoned for 205, 126, 126 and 5 days, respectively).

Congress is in concert with these results, having developed a formula in recent legislation, Victims of Trafficking and Violence Protection Act of 2000, Pub.L. 106–386, 114 Stat. 1464, 22 U.S.C.A. § 7101 (2000), which authorizes payments of approximately $10,000 per day of captivity to American victims of terrorists who have been held hostage.

■ Although not held hostage in the traditional sense of that phrase, the person of Ms. Mousa was misappropriated by defendants— by means of horrible, violent injuries— to make a political statement, and has thus been held hostage in mind and body by Iran-sponsored terrorists for nearly six years, with no hope of relief from that captivity for the rest of her life.

The Court therefore concludes as a matter of law that an appropriate amount of compensatory damages for past and future pain and suffering for Leah Mousa, the plaintiff, is twelve million dollars ($12,000,-000).

■ (3) *Punitive Damages.* Punitive damages are awarded to punish a defendant for particularly egregious conduct, and to serve as a deterrent to future conduct of the same type. They require an assessment by the Court of the wealth and character of the defendant. *Flatow,* 999 F.Supp. at 32. Since the *Flatow* case, Iran's economic situation has greatly improved with the upturn in world oil prices, as detailed in the testimony of Dr. Clawson. According to Dr. Clawson, in 1996, the amount spent on terrorism by Iran was between $50,000,000 and $100,000,000.00, a substantial increase from 1995, the year of the attack in the *Flatow* case. District Courts here have recently found that three times the amount Iran spends on such terrorist activities is a reasonable punitive damage award. *See, e.g., Jenco v. Islamic Republic of Iran, supra,* at 29; *Eisenfeld v. Islamic Republic of Iran, supra,* at 12 (involving the same bus bombing as that at issue here); *Sutherland v. Islamic Republic of Iran, supra,* at 47; and *Anderson v. Islamic Republic of Iran, supra,* at 114 (courts in each case awarded $300,000,000).

The Court finds that an award of punitive damages of one hundred and twenty million Dollars ($120,000,00) will serve to punish defendants and deter future attacks such as the one that caused Ms. Mousa such grievous injuries.