In the instant case, there is more than a "reasonable connection" between Iran's provision of material support, in the form of financing, weapons, training and ideological support, and the act of terrorism in this case. Plaintiffs presented expert testimony that Iran's support of Hamas was given to allow this group to commit precisely the type of militant terrorist act in Israel as occurred in this case. Clawson Tr. 74 (Hamas was founded in 1987 to carry out militant attacks against Israel, and Iran turned to Hamas as the "principal instrument" they used to sponsor terrorist attacks against Israel); Levitt Tr. 91 (Mere days before the attack, U.S. officials were discussing how Iran provided the majority of Hamas's financing); Levitt Tr. 92 (Once Hamas's political wing won elections in 2006, and then took over the Gaza Strip by force of arms from other Palestinian forces, "Iran increased support again, especially in terms of the provision of weapons, which were smuggled through Sinai into the Gaza Strip through tunnels dug underneath the Gaza-Egyptian border."); Levitt Tr. 107 (testifying that "one of the things that was most important to Hamas was to be able to have what we in the United States might describe as a 'train the trainer program.' "); Clawson Tr. 76 ("[O]n the Sunday after this attack, there was an article in the Sunday Times of London by a very noted correspondent ... who said there had been 150 people *136 from Hamas's military wing who at that point had been trained in Iran).
The Court finds that Iran's provision of material support and resources to Hamas was a substantial factor in the events that led to the incident at the Mercaz Harav Yeshiva whereby eight young men were killed. Clawson Tr. 75 ("[S]tarting in 1993, Iran provided material support to Hamas, and to help Hamas develop sophisticated expertise that allows it to carry out more deadly terrorist attacks."); Levitt Tr. 112 ("What we mean by material support [provided by Iran to Hamas] is the provision of the multiple types of support to ... a foreign terrorist organization [which] would include funds, actual money, in-kind services, and other things like weapons or their services or benefits."); Levitt Tr. 110-111 (noting that Iran provided "[m]illions of dollars [ ] [a]round this time, at a minimum, many tens, probably in the low hundreds of millions of dollars" and further that it is more "if you start to try and quantify the monetary value of goods, of rockets or other things" provided to Hamas).
The Court further finds that the terrorist incident at the Mercaz Harav Yeshiva by Hamas was reasonably foreseeable because of Iran's conduct. Clawson Tr. 75 ("[A]fter Hamas took over the Gaza Strip in 2007, ... we saw the head of Hamas visiting Tehran and we saw a lot of assistance coming from Iran to Hamas ... [and] just a few days before the episode that brings us here today, then secretary of state Condoleeza Rice said it was very clear that Iran was arming Hamas."). In describing what Iran gets out of the material support it provides to Hamas, Dr. Levitt responded that:
Iran is quite explicit in its desire to eradicate the State of Israel; it's very clear on this topic, through and including to today.... What it gets out of the support is being able to have proxies who are frontline combatants with Israel ... Having terrorist groups like ... Hamas on the West Bank and the Gaza Strip able to carry out attacks there and, of course, in Israel proper, including, as we saw in this instance in Jerusalem, enables Iran to be able to have a long arm to attack Israel, which, unfortunately, is a stated goal of that regime.
Levitt Tr. at 93.
Accordingly, Plaintiffs have satisfied the two parts of the standard set out in Owens -that Iran's provision of material support was a substantial factor in the sequence of events leading to Yonadav's death, and that the shooting at the Mercaz Harav Yeshiva, which resulted in Yonadav being murdered, was reasonably foreseeable or anticipated as a consequence of Iran's actions. Having determined that Iran provided material support to Hamas, and that this support caused the acts of extrajudicial killing at issue in this case, the Court concludes that it has subject matter jurisdiction over Plaintiffs' claims under the FSIA's terrorism exception.
B. Personal Jurisdiction
The Court also has personal jurisdiction over Defendant Iran. "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title." 28 U.S.C. § 1330(b). The Court has already concluded that it has subject matter jurisdiction over the claims in this case. Moreover, service has been made under section 1608. On October 10, 2017, the Court issued a Memorandum Opinion and Order in which it found that Iran must be treated as a "foreign state" amenable to process under Section 1608, and that Plaintiffs had accomplished service under *137 Section 1608(a)(4). Memorandum Opinion and Order, ECF No. 27. The Court incorporates by reference the analysis in that Memorandum Opinion and accordingly concludes that this Court has personal jurisdiction over the Defendants. There are no due process concerns raised by the Court's exercise of personal jurisdiction over the Defendant because "foreign states are not "persons'" protected by the Fifth Amendment." Price , 294 F.3d at 96.
C. Timeliness
There is a limitations provision in Section 1605A(b), which sets forth the time during which an action "may be brought or maintained." 28 U.S.C. § 1605A (b). This limitations provision is not jurisdictional. See Worley v. Islamic Republic of Iran , 75 F.Supp.3d 311, 328-332 (D.D.C. 2014). This section provides that an action may be brought "10 years after the date on which the cause of action arose." 28 U.S.C. Section 1605A(b)(2). In this case, the attack that gives rise to this civil action occurred on March 6, 2008, and the Complaint was filed on July 10, 2015, less than 10 years after the date the cause of action arose. Accordingly, the Plaintiffs' claims are timely under section 1605A of the FSIA.
D. Plaintiffs' Private Right of Action
There is a federal private right of action against designated state sponsors of terrorism for enumerated categories of persons, including "a national of the United States' or his "legal representative" for "personal injury or death caused by ... that foreign state ... for which the courts of the United States may maintain jurisdiction ... for money damages.[15] 28 U.S.C. § 1605A(c). Section 1605A's private right of action has four basic requirements relevant to the Plaintiffs in this case: (1) an extrajudicial killing, .. , or the provision of material support or resources for such an act where (2) the foreign state provided such support, and the act (3) caused a person death (4) for which courts of the United States may maintain jurisdiction under this section for money damages. 28 U.S.C. § 1605A(a)(1), 28 U.S.C. § 1605A (c). These requirements for a private right of action have already been discussed in detail in connection with jurisdiction.
The individual plaintiffs in this case may pursue section 1605A(c)'s private right of action as they are all United States citizens. 28 U.S.C. Section 1605A(c)(1). Michael Engelberg, who is a New York state resident (Am. Compl. ¶ 10) and may be a United States citizen, is before this Court in his capacity as administrator of Yonadav Hirshfeld's Estate, and because Yonadav Hirshfeld was a United States citizen, Mr. Engelberg qualifies under subsection (c)(4) of 28 U.S.C. Section 1605A (whereby the legal representative of a national of the United States may maintain a private right of action).
E. Plaintiffs' Theories of Recovery
While Section 1605A(c) provides a private right of action, it does not provide guidance on the substantive bases for liability to determine Plaintiffs' entitlement to damages. As noted by the Honorable Royce C. Lamberth in Roth:
[T]he court is not given the authority (or duty) to articulate "federal common law." Valore , 700 F.Supp.2d at 76. Instead, because liability under section 1605A(c) is based on "statutory rights," federal judges are instructed to "find *138 the relevant law, not to make it." Bettis v. Islamic Republic of Iran , 315 F.3d 325, 333 (D.C. Cir. 2003). Thus, judges may not "fashion a complete body of law" in considering claims under section 1605A(c). Id. Based on the D.C. Circuit's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery. Oveissi , 879 F.Supp.2d at 54 (quoting In re Islamic Republic of Iran Terrorism Litig. , 659 F.Supp.2d 31, 61 (D.D.C. 2009) ).
Roth , 78 F.Supp.3d at 399.
The plaintiffs in this action bring claims under 28 U.S.C. Section 1605A(c), on behalf of themselves and/or the Estate of Yonadav Hirshfeld, for wrongful death, survival, and intentional infliction of emotional distress/solatium. Amended Complaint, ECF No. 7.[16] Plaintiffs also plead these claims arising under undefined "state law." Plaintiffs can only have one recovery for their injuries, regardless of the number of theories upon which they base their complaint. See Kassman v. Am. Univ. , 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues.") In this case, Defendant Iran is liable to Plaintiffs under Section 1605A(c) and that subsection explicitly provides for the type of damages that Plaintiffs seek in relation to these claims-economic damages, pain and suffering, solatium, and punitive damages - and thus, the Court will proceed only based on the section 1605A(c) claims.
Prior to discussing the Plaintiffs' claims, the Court will determine whether Yonadav's estate - i.e., Michael Engelberg, in his capacity as administrator of the Estate of Yonadav Hirshfeld - has standing to recover for harms suffered after Yonadav was shot and prior to his death.
1. Standing of the Estate
The determination as to whether an estate may maintain a cause of action for injuries suffered during a decedent's life is governed by the law of the state where the estate is established. Taylor v. Islamic Republic of Iran , 811 F.Supp.2d 1, 12-13 (D.D.C. 2011). State law governs this issue because it is not related to the nature and extent of the claims, but rather, it involves a threshold inquiry regarding the "power of the estate to bring and maintain legal claims." Id. at 12. The Estate of Yonadav Hirshfeld ("the Estate") was admitted to probate in New York State. See Mot. for Default Judg., ECF No. 30, Ex. 4 (Letters of Limited Administration appointing Michael Engelberg as Fiduciary, issued by Surrogate's Court, County of New York, on Feb. 5, 2016). Under New York state law, an estate is entitled to assert claims for "survival damages" that consider decedent's pain and suffering prior to death. Anderson v. Islamic Republic of Iran , 753 F.Supp.2d 68, 82-83 (D.D.C. 2010) ; In re Estate of Maier , 682 N.Y.S.2d 831, 833, 178 Misc. 2d 1061, 1064 (N.Y. Sur. 1998) ("An action for personal injuries belongs to the victim of those injuries and survives the victim's *139 death as an asset of the estate enforceable by its personal representative....") Furthermore, the personal representative of a decedent may maintain an action to recover for damages for wrongful death. Barry & Sons, Inc. v. Instinct Productions, LLC , 15 A.D.3d 62, 66, 788 N.Y.S.2d 71 (1st Dept. 2005) ; see also N.Y.E.P.T.L. § 5-4.1 (McKinney 2003). Unlike damages for pain and suffering, damages for wrongful death do not accrue to the estate but go directly to distributees of the deceased. Heslin v. County of Greene , 14 N.Y.3d 67, 896 N.Y.S.2d 723, 727-728, 923 N.E.2d 1111, 1115-1116 (2010). When a deceased dies intestate and leaves neither spouse nor children, the parents are his "distributees," N.Y.E.P.T.L. § 4.1.1(a)(4) (McKinney 2003).
2. Wrongful Death
Plaintiffs seek recovery of economic losses accruing to the Estate of Yonadav Hirshfeld based on a claim of wrongful death. A decedent's heirs at law, acting through the decedent's estate, may bring a wrongful death action under section 1605A(c) to seek compensation "for economic losses which result from decedent's premature death." Valore , 700 F.Supp.2d at 78 (quoting Flatow , 999 F.Supp. at 27.) Plaintiffs may recover for wrongful death upon establishing that Iran caused Yonadav Hirshfeld's death. See Restatement (Second) of Torts § 925. As noted above, under New York law, any damages for wrongful death accrue not to an estate, but directly to its "statutory distributees" of the deceased. In re Jackson's Estate , 335 N.Y.S.2d 587, 590, 71 Misc.2d 133, 134 (NY Sur. Court, Kings County 1972) (citing Matter of Maynard , 37 Misc. 2d 184, 234 N.Y.S.2d 282 ). In this case, Yonadav Hirshfeld's parents, are his "statutory distributees" because he died intestate and had neither spouse nor children. As previously discussed in this Memorandum Opinion, Plaintiffs have submitted satisfactory evidence demonstrating that Yonadav Hirshfeld's death was an extrajudicial killing effectuated by Hamas, which was receiving material support from Defendant Iran. Accordingly, Iran is liable for the economic losses resulting from Yonadav's premature death, and any damages awarded for wrongful death are recoverable by Yonadav Hirshfeld's parents, Elisheva and Zemach Hirshfeld.
3. Survival
A survival action accrues upon the death of an injured person and "limits recovery for damages for loss or impairment of earning capacity, emotional distress and all other harms, to harms suffered before death." Restatement (Second) of Torts § 926. The Estate of Yonadav Hirshfeld seeks damages for Yonadav's pain and suffering between the moment of the shooting, which injured him, and his ultimate death. Courts have awarded damages for "the victim's pain and suffering that occurred between the attack and the victim's death shortly thereafter." Haim v. Islamic Republic of Iran , 425 F.Supp.2d 56, 71 (D.D.C. 2006). An award of pain and suffering is inappropriate "[i]n the absence of evidence tending to show an attack resulted in the fatal but noninstantaneous injury of a victim and that the victim was conscious thereafter[.]" Worley v. Islamic Republic of Iran , 177 F.Supp.3d 283, 286 (D.D.C. 2016) ; see Roth , 78 F.Supp.3d at 402 (If the plaintiff cannot prove that the decedent consciously experienced time between an attack and subsequent death, a court must refuse to award damages for pain and suffering).
In this case, there was testimony by Shimon Balzam and Zvi Yehuda Kofman that Yonadav Hirshfeld was conscious after he was shot but before he died, which *140 is further demonstrated by the fact that Yonadav was able to run away from the shooter and into the stairwell of a nearby building, where he was later found dead. Balzam Depo. 12; Kofman Depo. 14-17. Mr. Kofman noted that while they were running from the shooter, Yonadav's blood "sprayed onto [Mr. Kofman's] arm" and Yonadav didn't say anything but he thought Yonadav shouted. Kofman Depo. 13. Mr. Balzam testified that Yonadav may have survived for up to 20 minutes after he was shot, as that is the time it took the emergency services to arrive. Balzam Dep. 13-15; Kofman Depo. 17. Mr. Balzam was shot during the March 6, 2008 incident, and he testified that he thought he was going to die from his injuries and he was "very scared." Balzam Depo. 13-14. He agreed that it was reasonable that Yonadav would have had similar thoughts after being shot. Balzam Depo. 15. These statements made under oath by two classmates who were with Yonadav at the time of the terrorist incident at the Mercaz Harav Yeshiva illustrate that the shooting which ultimately led to Yonadav's demise did not kill him instantaneously. The testimony demonstrates further that Yonadav experienced pain and suffering from the attack at the Mercaz Harav Yeshiva prior to his death, and his Estate is thus able to claim survival damages.
4. Intentional Infliction of Emotional Distress/Solatium
Plaintiffs seek to recover solatium damages on their claims against Defendant Iran for intentional infliction of emotional distress ("IIED"), which is a cause of action recognized as giving rise to liability under the FSIA.[17] See Reed , 845 F.Supp.2d at 212 ("An act that would otherwise constitute IIED gives rise to liability under the FSIA."). Plaintiffs have alternately asserted claims for IIED and solatium in their Fourth Cause of Action in the Amended Complaint. Solatium is "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." Belkin v. Islamic Republic of Iran , 667 F.Supp.2d 8, 22 (D.D.C. 2009) (citations omitted). Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." Id. (citing Stethem v. Islamic Republic of Iran , 201 F.Supp.2d 78, 89 (D.D.C. 2002) ); see Wamai v. Republic of Sudan , 60 F.Supp.3d 84, 94 (D.D.C. 2014) (Recovery for solatium is generally limited to "immediate family members - parents, siblings, spouses, and children[.]") "Solatium claims are typically brought by family members who were not present or injured themselves." Cohen , 238 F.Supp.3d at 84.
Under 1605A (c) "a solatium claim is indistinguishable from an IIED claim." Valore , 700 F.Supp.2d at 85 (citation omitted); see also Surette v. Islamic Republic of Iran , 231 F.Supp.2d 260, 269 n.8 (D.D.C. 2002) ("[i]n an intentional homicide case such as [a terrorist killing], solatium appears in any event to be indistinguishable from the intentional infliction of emotional distress for which the District of Columbia does generally allow recovery in tort") (internal quotation marks omitted). Courts can therefore look to cases analyzing either type of claim for guidance on the other. Valore , 700 F.Supp.2d at 85. The standard for an IIED claim in a *141 Section 1605A(c) case draws heavily upon principles set forth in the Restatement (Second) of Torts whereby defendants are liable for IIED if they "by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress" to the plaintiffs. Restatement (Second) of Torts § 46(1). The Restatement permits recovery not only by persons who are the recipients of the "extreme and outrageous conduct," but also by: (1) members of the victim's immediate family (2) who were present at the time of the extreme and outrageous conduct. Murphy v. Islamic Republic of Iran , 740 F.Supp.2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a) ).
In FSIA cases, the "immediate family" prong is construed strictly to generally permit recovery only by spouses, parents, siblings and children. Id. In contrast, the prong requiring presence has been waived because acts of terrorism are sufficiently extreme and outrageous to demonstrate that they are intended to inflict severe emotional harm on even those persons who are not present during the act. See Valore, 700 F.Supp.2d at 80 (the family members "need not be present at the time of a terrorist attack upon a third person to recover for several emotional injuries suffered as a result."); see also Restatement (Second) of Torts § 46, cmt. 1 (Am. Law Inst. 1977) (leaving "open the possibility of situations in which presence at the time may not be required").[18]
The plaintiffs herein, who are the parents and siblings of Yonadav Hirshfeld, have stated undisputed claims for IIED/solatium, as supported by their sworn testimony regarding the shock and anguish they suffered stemming from circumstances surrounding Yonadav's death. When considering claims of solatium/IIED by Yonadav's parents, this Court may presume that those in direct lineal relationships with victims of incidents of terrorism suffer compensable mental anguish. See Flatow v. Islamic Republic of Iran , 999 F.Supp. 1, 30 (D.D.C. 1998) (discussing solatium damages under a prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity). Regarding claims by Yonadav's siblings, the Court notes that testimony providing a "close emotional relationship" will usually be sufficient to sustain an award of solatium damages. Id.
The evidence in this case establishes that Iran provided material support and resources to Hamas with the understanding and intent that Hamas would carry out attacks in Israel, where such attacks would cause a high degree of emotional distress. See. e.g. Valore , 700 F.Supp.2d at 77 ("Acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest *142 degree of emotional distress.") (quoting Belkin v. Islamic Republic of Iran , 667 F.Supp.2d 8, 22 (D.D.C. 2009) ); Beer v. Islamic Republic of Iran , 574 F.Supp.2d 1, 12 (D.D.C. 2008) ("Defendants' conduct, in providing material support ... [to] Hamas to conduct suicide bombings, is extreme, outrageous and goes beyond all possible bounds of decency.") "[B]ecause of the appalling and extreme nature of terrorist attacks, courts in this district have generally held that a defendant is liable to the victim's family even if they were not physically present during the attack as long as there is some evidence that they suffered mental anguish and trauma as a result of it." Cohen , 238 F.Supp.3d at 85 (citations omitted), Roth v. Islamic Republic of Iran , 78 F.Supp.3d at 400 (same); Valore , 700 F.Supp.2d at 80 (same). Accordingly, Iran is liable to Yonadav Hirshfeld's family members on claims for intentional infliction of emotional distress/solatium.
Plaintiffs have thus established Iran's liability to the Plaintiffs under the federal private right of action against state sponsors of terrorism, 28 U.S.C. Section 1605A(c), on claims for wrongful death, survival, and intentional infliction of emotional distress/solatium. The damages allowable to the plaintiffs are discussed in the section that follows.
V. CONCLUSIONS OF LAW ON DAMAGES
The Plaintiffs in the instant case seek to recover economic, pain and suffering, solatium, and punitive damages to compensate for their losses and to punish Defendant Iran for its support of Hamas, a terrorist organization. To recover under the FSIA, a "default winner must prove damages 'in the same manner and to the same extent as any other default winner.' " Hill v. Republic of Iraq , 328 F.3d 680, 683-84 (D.C. Cir. 2003) (citation omitted). In the context of a default judgment, courts in this circuit distinguish between "the standard of proof necessary to establish a plaintiff's entitlement to damages and to assess the amount of those damages." Rhodes v. United States , 967 F.Supp.2d 246, 313 (D.D.C. 2013) (emphasis in original). In terms of future damages, "successful plaintiffs may recover damages by proving 'that the projected consequences are reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate.' " Fraenkel v. Islamic Republic of Iran , 892 F.3d 348, 353 (D.C. Cir. 2018) (citing Hill , 328 F.3d at 684 ). For past losses, plaintiffs must "prove the fact of injury with reasonable certainty," while the amount of damages may be based on a "reasonable estimate." Samaritan Inns, Inc. v. District of Columbia , 114 F.3d 1227, 1235 (D.C. Cir. 1997).
As previously noted, damages under Section 1605A(c) include "economic damages, solatium, pain and suffering, and punitive damages." The heirs of a deceased plaintiff may recover economic losses stemming from the wrongful death of the decedent, while immediate family members may recover solatium damages for their emotional injury, and all plaintiffs can recover punitive damages. Valore , 700 F.Supp.2d at 83. The decedent's estate may recover damages for pain and suffering if it can be proved that the decedent experienced pain and suffering prior to his death. Elahi v. Islamic Republic of Iran , 124 F.Supp.2d 97, 112 (D.D.C. 2000). In fashioning damage awards, "courts may look to expert testimony and prior awards for comparable injury" to determine the appropriate amount of compensatory damages. Braun v. Islamic Republic of Iran , 228 F.Supp.3d 64, 82 (D.D.C. 2017).
*143 A. Economic Damages
Section 1605A(c) authorizes courts to award economic damages for lost earnings suffered because of a terrorism victim's death. See Belkin , 667 F.Supp.2d at 24 (considering calculations that relied on reasonable and well-founded assumptions about the likely earnings of the decedent). As a general rule, loss of accretion damages are calculated by estimating a decedent's future earning potential based on the individual's work and education and adjusting that amount to account for inflation, rise in productivity, job advancement, and personal consumption. Stethem v. Islamic Republic of Iran , 201 F.Supp.2d 78, 87 (D.D.C. 2002). The report of an economist may "provide a reasonable basis" for determining the amount of economic damages due under Section 1605A(c). Reed , 845 F.Supp.2d at 214. Lost earnings are not difficult to quantify, but they must be supported by competent evidence, or they will be denied. Braun , 228 F.Supp.3d at 83 ; see also Kaplan v. Hezbollah , 213 F.Supp.3d 27, 40-42 (D.D.C. 2016) (declining to award economic damages because the plaintiffs "failed to meet the minimum evidentiary threshold supporting their respective claims for economic damages.")
In the instant case, Plaintiffs introduced the deposition testimony of Mark Berenblut, a forensic and investigative accountant educated at the London School of Economics, and "qualified in Canada and [ ] in the U.S. as [having] an investigative accountant specialty." See Transcript of April 10, 2018 Deposition of Mark Berenblut ("Berenblut Depo."), at 5. Mr. Berenblut has previously testified as an expert witness on economic damages in personal injury or wrongful death cases, and he testified as an expert in ten matters during the last four years. Id., see also Berenblut Depo., Ex. B [list of matters]. Mr. Berenblut's publications and presentations are listed in his curriculum vitae, which is attached to his report (Berenblut Depo., Ex. A). He previously authored a text called Proving Economic Loss, which was a "loose-leaf service updated every year of twice a year, although he [has not] done it now for a number of years" and that text dealt with "calculation of losses in personal injury, fatality, medical malpractice type of cases." Berenblut Depo. 6.
Mr. Berenblut used two different models to calculate lost earnings on behalf of Yonadav Hirshfeld. In the first model, Mr. Berenblut assumed that Yonadav would have had a career in Israel, and in the second model, he assumed that Yonadav would have had a career in the United States, because he had dual citizenship.[19] Berenblut Depo. 8. Mr. Berenblut's calculation of Yonadav's lost earnings may be summarized as follows:
[T]he total losses, depending on the level of achievement that one determines for Yonadav, in the U.S. would be the present value of those losses after taxes, after personal consumption, of between 2.2 million U.S. dollars and 3.2 million U.S. dollars, as shown in Table 1. And the alternative is, had he made a career in Israel, that those losses would be between approximately 950,000 U.S. dollars and 1.3 million U.S. dollars.
Berenblut Depo. 9.
In making these assessments, Mr. Berenblut considered the following: Yonadav's birthdate and date of death; his dual citizenship; his academic performance in high school ("top marks in all of his topics at the highest level"); and the size of Yonadav's *144 family and academic and career achievements of the family members. Berenblut Depo. 11-12. He then looked at averages for male earners with 16-plus years of school, in Israel and the United States, including not only earnings but also benefits. Berenblut Depo. 13-14. In his Israel model, Mr. Berenblut also looked at "male managers with 16-plus years of schooling as the alternative." Berenblut Depo. 13. In his United States model, Mr. Berenblut "looked at the third quartile, which is an upper quartile" to get another range which he thought "reasonable to measure [Yonadav's] earning capacity." Berenblut Depo. 13-14. He next factored in taxes and personal consumption, and he applied a present value factor and considered government-sponsored pension plans. Berenblut Depo. at 14-15. Mr. Berenblut opined that Yonadav could have achieved higher earnings than in his report, and he characterized his numbers as a "conservative range of estimates." Berenblut Depo. 15-16.
When Yonadav Hirshfeld was killed, he was an 18-year old student studying at the Mercaz Harav Yeshiva. Yonadav's father testified that Yonadav was studying "the Talmud in a very intense way" at the Mercaz Harav Yeshiva. Z. Hirshfeld Tr. 47. In response to a question about what Yonadav was planning on doing after he completed his studies, Zemach said that "It was] the first year of yeshiva studies, so it's too young to know what he would have done with it later." Id. See also Haya Dep. 17 ("[B]ased on his talents and capabilities, he would have grown up to be a Torah leader, a rabbi, someone who would have taught many, many others."); Yedidya Depo. 12 (Yonadav had a superior knowledge of the Mishnah and a real talent for memorizing it, to the extent that "[e]ven older students in the yeshiva .... would come to him to ask him where certain things were written and what they meant, to explain them...."). The testimony presented by Yonadav's parents and siblings is consistent in demonstrating that Yonadav was a student who excelled in his studies in high school and was serious about his studies, particularly his religious studies.
The suggested economic award amounts differ based upon two major factors: (1) whether Yonadav would have pursued his career in the United States or Israel; and (2) whether his prospective career would have been comparable to all male earners with the same amount of education, or to male earners at the managerial level with the same amount of education. Because Yonadav was only eighteen years old and in his first year at the Mercaz Harav Yeshiva when he died, it is more difficult to gauge what career path he would have eventually taken. To aid in a determination of appropriate economic damages, this Court considers the facts that are evident from the record: (1) Yonadav was serious about his religious studies and showed a particular aptitude and interest in these studies (E. Hirshfeld Tr. 12-13, Z. Hirshfeld Tr. 41-42, S. Hirshfeld Tr. 59, Yedidya Depo. 11-14); (2) most, if not all, of Yonadav's brothers studied at a yeshiva and some, including his father, are involved in professions that revolve around the Jewish religion (Z. Hirshfeld Tr. 39, S. Hirshfeld Tr. 49-50, Yedidya Depo. 6-7, David Depo. 6, 8, Nehemiya Depo. 6-7); and (3) all Yonadav's sibling and his parents live in Israel, and there is no indication in the record before this Court that Yonadav had ever been to the United States or had any desire to go to the United States.
Given these facts, the Court concludes that the damage estimate based on Yonadav pursuing a career in Israel and comparing Yonadav's earning to all male earners (which would encompass male earners pursuing professions such as a rabbi or a *145 teacher) is the one that is better supported by the evidence in this case, and therefore, the Estate of Yonadav Hirshfeld shall receive an economic loss damage award of $950,000.00.
B. Pain and Suffering
Claims "for the conscious pain and suffering" inflicted on victims of terrorism are "actionable through their estates." Gates v. Syrian Arab Republic , 580 F.Supp.2d 53, 72 (D.D.C. 2008). Courts "will not simply award what [is] abstractly [found] to be fair," Weinstein , 184 F.Supp.2d 13, 23 (D.D.C. 2002), even while "[p]utting a number on these kinds of harms can be difficult." Price v. Socialist People's Libyan Arab Jamahiriya , 384 F.Supp.2d 120, 134 (D.D.C. 2005). Courts look to "damage awards for pain and suffering in other cases brought under the FSIA" with the effect that "precedence guides [ ] calculations." Id. "In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards." Harrison v. Republic of Sudan , 882 F.Supp.2d 23, 48 (D.D.C. 2012) (quoting Valore , 700 F.Supp.2d at 84 ).
Proceeding on this basis, a review of relevant precedents reveals the importance of whether a fatal injury was instantaneous. If a fatal injury was not instantaneous, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his death. Estate of Botvin v. Islamic Republic of Iran , 873 F.Supp.2d 232, 244 (D.D.C. 2012). If the plaintiff does prove the decedent's conscious state, courts have awarded damages of one million dollars for periods of pain and suffering lasting anywhere from less than a minute to a few hours after an attack but prior to death. Braun , 228 F.Supp.3d 64, 83 (D.D.C. 2017) ; see e.g. Stethem v. Islamic Republic of Iran , 201 F.Supp.2d at 89 (awarding $1,000,000 for the several minutes after the victim was shot and before he died); Eisenfeld v. Islamic Republic of Iran , 172 F.Supp.2d 1, 5, 8 (D.D.C. 2000) (awarding compensatory damages of $1,000,000 each for "several minutes" of pain and suffering by two decedents who died at the scene of a bombing); Elahi v. Islamic Republic of Iran , 124 F.Supp.2d 97, 113 (D.D.C. 2000) (awarding $1,000,000 for 3-4 minutes of pain and suffering); Flatow , 999 F.Supp. at 28-29 (awarding $1,000,000 for 3 to 5 hours of pain and suffering).
Shimon Balzam and Zvi Yehuda Kofman testified that Yonadav Hirshfeld was alive for at least several minutes after being shot, as demonstrated by the fact that Yonadav ran from the place where he was shot into a building that was located approximately 14-20 meters away and he was able to make it another 4 meters into the stairwell landing before he fell. Balzam Depo. 11-12; Kofman Depo. 13-14, 16-18. While the three students were running away from the shooter, Mr. Kofman heard Yonadav scream in pain or fear, and he felt Yonadav's blood spraying onto his shirt. Kofman Depo. 13,17, 23. Neither Mr. Balzam nor Mr. Kofman could say exactly when Yonadav died but at the time emergency services arrived, approximately 20 minutes after the incident, Yonadav was deceased. Balzam Dep. 13-15, 29; Kofman Depo. 15-17. In this case, it is clear from the evidence that Yonadav was conscious, fearful and suffering for at least a few minutes after he was shot because he was able to run away from the shooter and into a building and then make it to the stairwell, where he was later found deceased. Accordingly, Yonadav Hirshfeld's Estate is entitled to $1,000,000.00 in survival damages *146 for Yonadav's pain and suffering after the attack and prior to his death.
C. Solatium
In this Circuit, the "seminal opinion explaining the origins and particulars of solatium damages" in claims under the FSIA is Flatow v. Islamic Republic of Iran , 999 F.Supp. 1 (D.D.C. 1998). Fraenkel , 892 F.3d at 356. As explained therein, "[s]olatium is traditionally a compensatory damage which belongs to the individual heir personally for injury to the feelings and loss of decedent's comfort and society [which] began as a remedy for the loss of a spouse or a parent [but] has since expanded to include the loss of a child." Flatow , 999 F.Supp. at 29. For solatium claims based on the loss of a sibling, the claimant must "prove a close emotional relationship with the decedent." Id. at 30. Solatium encompasses the "mental anguish, bereavement and grief resulting from the fact of the decedent's death," and because damages for mental anguish are fact-dependent, these claims require case-by-case analysis. Flatow , 999 F.Supp. at 30. When a terrorist act results in death, that emotional distress, "with its attendant horrific surrounding circumstances, prevents the anguish [felt by a relative of the deceased] from subsiding." Id. at 31. Solatium damages are therefore available as compensation for the "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as a result of the decedent's death, as well as the harm caused by the loss of the decedent, society and comfort." Baker v. Socialist People's Libyan Arab Jamahirya , 775 F.Supp.2d 48, 83 (D.D.C. 2011) (internal quotation marks and citation omitted). Solatium damages are available even though those plaintiffs were not "present at the place of outrageous conduct." Heiser v. Islamic Republic of Iran , 659 F.Supp.2d 20, 27 (D.D.C. 2009) (" Heiser II ").
In situations where the victim was killed as opposed to being injured, factors considered by courts include: "(1) whether the decedent's death was sudden and unexpected; (2) whether the death was attributable to negligence or malice; (3) whether the claimants have sought medical treatment for depression and related disorders resulting from the decedent's death; (4) the nature (i.e., the closeness) of the relationship between the claimant and the decedent; and (5) the duration of the claimants' mental anguish in excess of that which would have been experienced following the decedent's natural death." Stethem , 201 F.Supp.2d at 89-90. Courts put emphasis on the cause of death in terrorism cases, when considering that "the fact of death and the cause of death can become inextricably intertwined, thus interfering with the prospects for anguish to diminish over time." Elahi , 124 F.Supp.2d at 111.
Even with these guideposts, claims for solatium, unlike those for lost wages, are difficult to quantify, and not readily susceptible to "models and variables." Id. (citations omitted). Accordingly, courts are often guided by remedial approaches and formulas applied in similar cases, and in cases where solatium damages are sought, most courts employ the damages model articulated in Estate of Heiser v. Islamic Republic of Iran , 466 F.Supp.2d 229 (D.D.C. 2006) (" Heiser I "). In that case, the Honorable Royce C. Lamberth developed a standardized approach for evaluating IIED claims for solatium damages, after surveying past awards to family members of victims of terrorism. Roth v. Islamic Republic of Iran , 78 F.Supp.3d at 403. Pursuant to the Heiser damages model, "[s]pouses typically receive greater damages awards than parents, who, in turn, typically receive greater awards than siblings."
*147 Heiser I , 466 F.Supp.2d at 269. The damages framework set out in Heiser I anticipated awards between $8 million and $12 million for pain and suffering resulting from the death of a spouse, $5 million for parents of deceased victims, and $2.5 million for siblings. Id.
The Heiser "damages model" was explained succinctly in Braun v. Islamic Republic of Iran, as follows:
In determining the appropriate amount to compensate for victims' family members' emotional distress, "the Court may look to prior decisions awarding damages ... for solatium." Acosta [v. The Islamic Republic of Iran ], 574 F.Supp.2d [15] at 29 [ (D.D.C. 2008) ]. Solatium damages, by their nature, are "unquantifiable," Moradi [v. Islamic Republic of Iran ], 77 F.Supp.3d [57] at 72 [ (D.D.C. 2015) ], and therefore, this Court has developed a commonly accepted standardized framework, known as the Heiser damages framework, for solatium damages. Estate of Heiser , 466 F.Supp.2d at 269 ; see Roth , 78 F.Supp.3d at 403 (noting the "framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror (citing Valore , 700 F.Supp.2d at 85 ) ). As a baseline, the framework awards "approximately $5 million to a parent whose child was killed" in a terrorist attack. Estate of Heiser , 466 F.Supp.2d at 269.
Braun , 228 F.Supp.3d at 85.
The numbers set forth under the Heiser I damages framework are "not set in stone." Murphy , 740 F.Supp.2d at 79, as "strict application of precedent could lead to conflicting conclusions about an appropriate award." Brewer v. Islamic Republic of Iran , 664 F.Supp.2d 43, 57 (D.D.C. 2009) (quotation omitted). Courts have discretion to deviate from the Heiser framework and may enhance the award depending on factors such as an especially close relationship between the plaintiff and the decedent, the circumstances surrounding the terrorist attack which made it particularly agonizing, and medical proof of a claimant's severe pain, grief or suffering. Oveissi v. Islamic Republic of Iran , 768 F.Supp.2d 16, 26-27 (D.D.C. 2011). Downward departures may be justified where the evidence suggests an attenuated relationship between the victim and his family members. Valore v. Islamic Republic of Iran , 700 F.Supp.2d 52, 86 (D.D.C. 2010) ; see Relvas v. Islamic Republic of Iran , Case No. 1:14-cv-01752, 2018 Westlaw 1092445 *5 (D.D.C. Feb. 28, 2018) (adjusting the damages for one plaintiff downward based on "the paucity of evidence describing the relationship between the [claimant and decedent]"); see also Roth v. Islamic Republic of Iran , 78 F.Supp.3d at 406 (denying an award of solatium damages "where no evidence [was] offered to show injury that an award of solatium damages might compensate.") While "many FSIA decisions issued by the District Court follow Heiser's solatium damages model," the District Court "[is] not required to follow Heiser for the simple reason that Heiser is not controlling precedent." Fraenkel , 892 F.3d at 361 ; see Labow v. U.S. Dep't. of Justice , 831 F.3d 523, 532 (D.C. Cir. 2016) (noting that district court opinions do not establish binding precedent on other courts).
This Court has spent a considerable amount of time examining the nature of the relationship between Yonadav Hirshfeld and his parents and 12 siblings, including:
• The way Yonadav's parents reacted to the news of the incident at the Mercaz Harav Yeshiva and how they had to wait for hours before they were informed of Yonadav's *148 death (E. Hirshfeld Tr. 16-18, Z. Hirshfeld Tr. 42-43);
• The circumstances surrounding Zemach's identification of Yonadav's body (Z. Hirshfeld Tr. 44);
• The support Yonadav's parents sought through participation in a survivors' support group for a period of two years (E. Hirshfeld Tr. 21-23);
• The annual memorial services held for Yonadav, which involve participation by his parents and siblings (E. Hirshfeld Tr. 23, 26-27, 30, 33, Haya Depo. 14);
• Some of the special bonds between Yonadav and his siblings such as how he and his two brothers shared a room (S. Hirshfeld Tr. 54, 57-58), shared activities (David Depo. 14-15, Nehemiya Depo. 14), studied together (Yedidya Depo. 10-11, Hana Decl. Paragraph 4), and worked together (Hana Decl. ¶ 4, S. Hirshfeld Tr. 58);
• The physical and emotional effects of Yonadav's death on his siblings (Zimrat Depo. 16, E. Hirshfeld Tr. 30, 32, David Depo. 12, Amiel Decl. ¶¶ 4-5, S. Hirshfeld Tr. 54, 57-58);
• The help sought by Yonadav's siblings to cope with his death (Nehemiya Depo. 16-17, David Depo. 13-14;
• The ways in which Yonadav is missed and remembered at family events and celebrations (Haya Depo. 13-14, Yedidya Depo. 14-15, Hana Decl. ¶ 10, David Depo. 16, Nehemiya Depo. 16);
• The difficulty some of the siblings have in discussing Yonadav (Yedidya Depo. 14-15, Nehemiya Depo. 17-18);
• The other ways in which Yonadav is remembered, including Aviya naming her son for him (Aviya Decl. Paragraph 10) and Haya's husband establishing a non-profit religious organization in honor of Yonadav (Haya Depo. 17).
The Court concludes that Elisheva's Hirshfeld's statements that Yonadav "loved everybody" and "loved to play with [his siblings], he loved to talk to them, he loved to have fun" and "everybody [in the family] felt close" aptly describe Yonadav and his large and loving family. Accordingly, this Court sees no reason to deviate from the guidance set forth in the Heiser case and shall award Elisheva and Zemach Hirshfeld $5,000,000.00 each in solatium damages, and each of Yonadav's 12 siblings shall be awarded $2,500,000.00 in solatium damages.
D. Punitive Damages
Under the FSIA, a state sponsor of terrorism may be held liable for punitive damages. 28 U.S.C. Section 1605A(c). Punitive damages are designed to "punish [the defendant] for [its] outrageous conduct and to deter [it] and others like [it] from [engaging in] similar conduct in the future." Restatement (Second) of Torts § 908(1) ; see Bodoff v. Islamic Republic of Iran , 907 F.Supp.2d 93, 105 (D.D.C. 2012) ; accord Oveissi v. Islamic Republic of Iran , 879 F.Supp.2d 44, 55-56 (D.D.C. 2012). "Punitive damages are warranted where 'defendants supported, protected, harbored, aided, abetted, enabled, sponsored, conspired with, and subsidized a known terrorist organization whose modus operandi included the targeting, brutalization and murder of American citizens and others.' " Braun , 228 F.Supp.3d at 86 (citing Baker , 775 F.Supp.2d at 85 ). In the instant case, punitive damages are warranted *149 to punish Iran for its material support of Hamas, a terrorist group.
To calculate punitive damages, courts in similar cases have considered "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." Wultz v. Islamic Republic of Iran , 864 F.Supp.2d 24, 41 (D.D.C. 2012) (quoting Acosta , 574 F.Supp.2d at 30 ). Regarding the first factor, as previously detailed by this Court, Defendant Iran provided financial and material support for Hamas, with the end goal of Hamas carrying out terrorist attacks in Israel. Defendant's callous actions of providing material support for Hamas' terrorist activities deserve condemnation. The second factor points further to punitive damages insofar as Yonadav Hirshfeld, an 18-year old student, was suddenly and unexpectedly shot and killed by a Hamas shooter targeting Jewish unarmed students at their school, which left Yonadav's parents and siblings emotionally distraught. The third factor -the need for deterrence - is bolstered by the expert testimony in this case which indicated that Iran's support of Hamas is ongoing. This deterrence factor is affected by the existence of prior awards of punitive damages for the same incident. Upon a search of FSIA cases, it does not appear that there are any prior punitive damage awards arising from this specific incident, and thus, the punitive damages awarded in this case need not be adjusted downward for that reason. While there is "[n]o principle" prohibiting a plaintiff from recovering punitive damages "simply because punitive damages have previously been awarded against the same defendant ... for the same conduct," courts do consider the effects of cumulative punitive awards. Weinstein v. Islamic Republic of Iran , 184 F.Supp.2d at 25-26 (internal citations omitted). Regarding the wealth of Defendant Iran, which is the fourth factor to be considered, the expert testimony in this case affirms that Iran was willing and able to commit to spending hundreds of millions of dollars in support of Hamas. Levitt Tr. 110-111.
Courts have used several different approaches to the calculation of punitive damages against foreign sovereign defendants who support terrorism. See Gill v. Islamic Republic of Iran , 249 F.Supp.3d 88, 105 (D.D.C. 2017) (Punitive damages may be calculated by generating a multiplicand and multiplier, with the multiplicand being either the defendant's annual expenditures on terrorist activities - used for exceptionally deadly attacks - or the amount of compensatory damages already awarded, which is used in cases without exceptional circumstances. The multiplier used by judges in this Court ranges from three to five).
One approach is to multiply the foreign state's "annual expenditures on terrorism" by a factor between three and five. This approach, which may result in awards in the billions of dollars, has been used in the case of exceptionally deadly attacks, such as the 1983 bombing of the Marine barracks in Beirut, which killed 241 American military servicemen. Another approach awards a fixed amount of $150,000,000 per affected family.
Braun v. Islamic Republic of Iran , 228 F.Supp.3d 64, 87 (2017) (internal citations omitted) (using the $150 million approach to punitive damages); Wyatt v. Syrian Arab Republic , 908 F.Supp.2d 216, 233 (D.D.C. 2012) (awarding $300 million in punitive damages to two victims and their families); Baker , 775 F.Supp.2d at 86 (awarding $150 million each to families of three victims); Gates , 580 F.Supp.2d at 75 (awarding $150 million each to the estates of two victims).
*150 Defendant Iran's conduct in providing material support to the terrorist group Hamas that perpetrated the attack at the Mercaz Harav Yeshiva, whereby young students at a Jewish religious educational institution were targeted and eight of them were killed, is outrageous. The conduct is however more similar to conduct in cases involving awards of $150 million in punitive damages than in cases where a multiplier of [Iran's] expenditures on terrorism is used, and accordingly, this Court will award $150,000,000.00 in punitive damages to the family of Yonadav Hirshfeld against Defendant Iran.
VI. CONCLUSION
For the foregoing reasons, the Court GRANTS default judgment against Defendant the Islamic Republic of Iran ("Iran") and awards damages totaling $191,950,000.00 to the Plaintiffs herein. More specifically, the Estate of Yonadav Hirshfeld shall be awarded $1,000,000.00 in damages for Yonadav Hirshfeld's pain and suffering. Yonadav Hirshfeld's parents, Elisheva and Zemach Hirshfeld, shall be awarded $5,000,000.00 each in solatium damages and $950,000.00 jointly in economic damages. Yonadav's twelve siblings - Shalom Hirshfeld, Zimrat Bracha Zuckerman, Haya Hamital Novik, Yedidya Hirshfeld, Hana Shandorfy, David Yinon Hirshfeld, Aviya Freedman, Nehemiya Hirshfeld, Amiel Hirshfeld, Elyashiv Schmuel Hirshfeld, and minors EH and SH (through their mother) - shall each be awarded $2,500,000.00 in solatium damages. Punitive damages against Iran are awarded in the amount of $150,000,000.00 to the family of Yonadav Hirshfeld. An appropriate Order accompanies this Memorandum Opinion.

A "national of the United States" means a "citizen of the United States" or a person owing "permanent allegiance" to the United States, as per the definition set forth in 8 U.S.C. § 1101(a)(22). 28 U.S.C. § 1605A (h)(5).

The Amended Complaint also includes a claim for loss of consortium damages, but a loss of consortium often requires that the party complaining of the loss must have been married to the victim-spouse at the time the cause of action accrued, and decedent Yonadav Hirshfeld was unmarried. Nor did Plaintiffs proffer any evidence related to a loss of consortium claim.

The Court addresses Plaintiff's IIED and solatium claims as one claim. See Kassman, supra . (permitting only one recovery for a single injury).

The appellate court in this circuit recently considered state-law claims for IIED brought against Sudan and Iran by foreign family members of victims of the United States embassy bombings in Tanzania and Kenya, where the issue of waiving the "presence" requirement was challenged by defendant Sudan. Owens v. Republic of Sudan , 864 F.3d 751, 809-812 (D.C. Cir. 2017), petition for cert. filed , 864 F.3d 751 (Mar. 6, 2018) (No. 17-1406). The Circuit Court noted that this matter of "abandoning the presence requirement in FSIA terrorism cases" remains undecided and further, that in the case of state law claims, D.C. law controls the scope of the IIED claim, but the D.C. Court of Appeals "has yet to render a decision on the matter." Id. at 811-812. Accordingly, the following question was certified to the D.C. Court of Appeals:
Must a claimant alleging emotional distress arising from a terrorist attack that killed or injured a family member have been present at the scene of the attack in order to state a claim for intentional infliction of emotional distress?
Id. at 812.

As noted by Yonadav's brother Nehemiya, "Yonadav was the only one who spoke English well." When they visited their grandmother who only spoke English, Nehemiya wanted Yonadav "to come with us so he could speak better." Nehemiya Depo. 14.